Nicolai Cocis, CA Bar No. 204703
nic@cocislaw.com
Law Office of Nicolai Cocis
25026 Las Brisas Road
Murrieta, CA 92562
(951) 695-1400 (phone/facsimile)

Mathew D. Staver*
court@LC.org
Horatio G. Mihet*
hmihet@LC.org
Roger K. Gannam*
rgannam@LC.org
Daniel J. Schmid*
dschmid@LC.org
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770 (facsimile)
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

---

| | |
|---|---|
| HARVEST ROCK CHURCH, INC., and HARVEST INTERNATIONAL MINISTRY, INC., itself and on behalf of its member churches in California, <br><br> *Plaintiffs*, <br><br> v. <br><br> GAVIN NEWSOM, *in his official capacity as* Governor of the State of California, <br><br> *Defendant*. | Case No._____ <br><br> **VERIFIED COMPLAINT** |

---

**"Neither a state nor the Federal Government
can set up a church. . . . Neither can force nor influence
a person to go to or to remain away from church against his will."**
*Everson v. Bd. of Educ. of Ewing Twp.*, **330 U.S. 1, 15 (1947).**

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES

For their Verified Complaint against Defendant, GAVIN NEWSOM, in his official capacity as Governor of the State of California, Plaintiffs, HARVEST ROCK CHURCH, INC., and HARVEST INTERNATIONAL MINISTRY, INC., itself and on behalf of its member churches in California, allege and aver as follows:

## URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER

1.      In their Prayer for Relief, *infra*, and in the contemporaneously filed Motion for Temporary Restraining Order (TRO), Plaintiffs seek a TRO and preliminary injunction restraining enforcement against Plaintiffs of the various COVID-19 orders issued by Governor Newsom and other State officials—

—**Prohibiting gathering for any indoor worship services in over 30 counties in California** (including those where many of Plaintiffs' churches are located) and, in the counties where indoor worship is not totally prohibited, prohibiting gathering for indoor worship with 101 or more individuals, or at over 25% capacity (whichever is lower);

—**Prohibiting singing or chanting during religious worship** in counties where indoor worship remains permissible;

—**Prohibiting gatherings inside private homes for small-group Bible studies** and worship services; and

—Imposing discriminatory and disparate prohibitions on the types of activities that Plaintiffs may engage in at their own church buildings, as the orders allow Plaintiffs to feed the hungry, clothe the naked, house the homeless, and provide other material social services to an unlimited number of individuals with unlimited volunteers in a single church building, but **the Orders prohibit Plaintiffs from engaging in a religious worship service with the same individuals in the same church building, on pain of criminal penalties**. A TRO and preliminary injunction are necessary to protect these vitally important and constitutionally protected liberties, even in the midst of disease.

2.     Additionally, while the Governor has unilaterally and significantly restricted the number of individuals permitted to "gather" in Plaintiffs' churches, he has imposed no similar restrictions on the untold thousands of protesters who have gathered all throughout California cities with no threat of criminal sanction, and no social distancing or restrictions whatsoever. And, **the Governor explicitly encouraged such large gatherings of protesters while condemning churches for signing hymns in their churches.**

3.     At around the same time that Governor Newsom's Executive Orders and the State's Public Health Orders regarding COVID-19 were being used to threaten criminal sanctions on Plaintiffs' pastors, officials in other jurisdictions had similarly threatened to impose criminal sanctions on other religious gatherings. Twice in two weeks the Sixth Circuit Court of Appeals enjoined enforcement of executive orders like the Governor's orders, determining that restrictions on drive-in **and in-person** worship services violate the First Amendment. *See Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (**in-person** worship services); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir.

2020) (holding plaintiffs likely to succeed on merits of First Amendment and Kentucky RFRA claims for both drive-in and **in-person** services). Also, in *First Pentecostal Church v. City of Holly Springs, Miss.*, 959 F.3d 669 (5th Cir. 2020), the Fifth Circuit Court of Appeals granted an IPA to a Mississippi church, enjoining enforcement of the Mississippi Governor's order restricting worship.

4. In *Roberts*, the Sixth Circuit granted an IPA enjoining the Kentucky Governor from enforcing executive orders prohibiting a church's in-person worship services when "serial exemptions for secular activities pose comparable public health risks." 958 F.3d at 414. In determining the plaintiffs' likely success on the merits of their free exercise claims, the court recognized, "On one side of the line, a generally applicable law that incidentally burdens religious practice usually will be upheld." *Id.* at 413 (citing *Emp't Div. v. Smith*, 494 U.S. 872, 879–79 (1990)). But, the court concluded the Kentucky orders "likely fall on the prohibited side of the line," where "a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id.* (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1993)).

5. Expanding on the problems with Kentucky's orders, the court explained,

> **Do the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws? We think so.** As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law. At some point, **an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny**.

*Id.* at 413–14 (cleaned up) (emphasis added).

6. Continuing, the court reasoned, "Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers." *Id.* at 414. Thus, the court rejected the Governor's suggestion "that the explanation for these groups of people to be in the same area—intentional worship—creates greater risks of contagion than groups of people, say, in an office setting or an airport," *id.* at 416, further explaining,

> the reason a group of people go to one place has nothing to do with it. Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there. So long as that is the case, why do the orders permit people who practice social distancing and good hygiene in one place but not another for similar lengths of time? It's not as if law firm office meetings and gatherings at airport terminals always take less time than worship services.

*Id.*

7. The *Roberts* court also rejected the notion that the Governor's orders were justified because congregants could simply worship online via Facebook, reasoning,

> Who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name," Matthew 18:20, or what it means when "not forsaking the assembling of ourselves together," Hebrews 10:25.
>
> [T]he Free Exercise Clause does not protect sympathetic religious practices alone. And that's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it.

*Id.* at 415 (citation omitted).

8.     In awarding the injunction, the *Roberts* court brought into sharp relief the Kentucky Governor's disparate treatment of churchgoers under his orders:

> Keep in mind that the Church and its congregants just want to be treated equally. . . . They are willing to practice social distancing. They are willing to follow any hygiene requirements. . . . **The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same**.
>
> Come to think of it, aren't the two groups of people often the *same people*—going to work on one day and going to worship on another? **How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation, or at least the Governor has not provided one.**

*Id.* at 414 (emphasis added).

9.     A week after the Sixth Circuit's *Roberts* decision, the Eastern District of North Carolina issued a TRO enjoining the North Carolina Governor from enforcing a 10-person limit on religious worship because it violated the Free Exercise Clause. *See Berean Baptist Church v. Cooper*, No. 4:20-cv-81-D, 2020 WL 2514313 (E.D.N.C. May 16, 2020) [hereinafter *Berean Baptist*]. In granting the TRO, the court noted upfront, "**There is no pandemic exception to the Constitution of the United States or the Free Exercise Clause of the First Amendment**." 2020 WL 2514313, at *1 (emphasis added).

10.     The North Carolina "stay-at-home" orders challenged in *Berean Baptist* provided exemptions from their 10-person gathering limits for numerous "Essential Business and Operations." *Id.* at *3. But, the North Carolina orders subjected worship services to a 10-person limit that was not imposed on any of the myriad "Essential" businesses and activities. 2020 WL 2514313, at *4. The *Berean Baptist* court observed

that the uniquely restrictive 10-person limit for worship gatherings "represent[s] precisely the sort of 'subtle departures from neutrality' that the Free Exercise Clause is designed to prevent." *Id.* at *6 (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)).

11.   The court observed further,

> Eleven men and women can stand side by side working indoors Monday through Friday at a hospital, at a plant, or at a package distribution center and be trusted to follow social distancing and hygiene guidance, but those same eleven men and women cannot be trusted to do the same when they worship inside together on Saturday or Sunday. "The distinction defies explanation . . . ."

*Id.* at *8 (quoting *Roberts*, 958 F.3d at 414).

12.   Thus, the court concluded, "These **glaring inconsistencies** between the treatment of religious entities and individuals and non-religious entities and individuals take [the orders] outside the 'safe harbor for generally applicable laws.'" *Id.* (quoting *Roberts*, 958 F.3d at 413).

13.   Ultimately, in concluding the North Carolina orders could not pass strict scrutiny, the *Berean Baptist* court recognized that the plaintiffs "simply want the Governor to afford them the same treatment as they and their fellow non-religious citizens receive when they work at a plant, clean an office, ride a bus, shop at a store, or mourn someone they love at a funeral." *Id.* at *9 (citing *Lukumi*, 508 U.S. at 546 ("The proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree.")).

14.     In Louisville, Kentucky, the government threatened to use police to impose criminal sanctions on those individuals found in violation of similar COVID-19 orders and threatened to impose various sanctions on individuals found in violation of such orders. The United States District Court for the Western District of Kentucky found that the mere threat of such criminal sanction warranted a TRO. See *On Fire Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020) [hereinafter *On Fire*]. The *On Fire* TRO enjoined the Mayor of Louisville from "enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire." *Id.* at *1 (emphasis added).

15.     Additionally, the Governor of Kansas had imposed a similar restriction on religious gatherings in Kansas, stating that "gatherings" of more than 10 individuals are prohibited, including religious gatherings. On April 18, 2020, the United States District for the District of Kansas issued a TRO enjoining Kansas officials from enforcing its discriminatory prohibition on religious gatherings and required the government to treat "religious" worship services the same as other similar gatherings that are permitted. See *First Baptist Church. v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, *6–7 (D. Kan. Apr. 18, 2020) [hereinafter *First Baptist*]. The *First Baptist* TRO specifically stated that the government's disparate treatment of religious gatherings was a violation of the Free Exercise Clause because it showed that "**religious activities were specifically targeted for more onerous restrictions than comparable secular activities**," and that the churches had shown irreparable harm because they would "be prevented from gathering

8

for worship at their churches" during the pendency of the executive order. *Id.* at *7–8 (emphasis added).

16.   In discussing the Kansas orders, which imposed a 10-person limit on in-person gatherings, the court said that specifically singling out religious gatherings for disparate treatment while permitting other non-religious activities "show[s] that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral," *First Baptist*, 2020 WL 1910021, at *7, and—much like here— "**churches and religious activities appear to have been singled out among essential functions for stricter treatment**. It appears to be the only essential function whose core purpose—association for the purpose of worship—had been basically eliminated." *Id.* (emphasis added). Thus, the court found that a TRO was necessary and that Kansas should be enjoined from enforcing its orders' disparate terms against churches. Indeed, "it goes without saying that the government could not lawfully expressly prohibit individuals from meeting together for religious services." *Id.* at *6 (emphasis added).

17.   Also, several courts have found that the government's open encouragement of protesters flouting the various COVID-19 gathering restrictions across the country and the concomitant refusal by government officials to impose similar threats of criminal sanctions upon such massive gatherings while simultaneously threatening religious worship services that exceed the arbitrary numerical limitations represents a gross violation of the First Amendment.

18.   The constitutional incongruity of Governor Newsom's encouragement of protesters while restricting worshippers was highlighted by Judge Ho of the Fifth Circuit in his concurrence in *Spell v. Edwards*, 962 F.3d 175 (5th Cir. 2020), where the court

dismissed as moot an appeal arising from a church's challenge to Louisiana's stay-at-home orders restricting worship services to 10 people. 962 F.3d at 177. Judge Ho first recounted,

> At the outset of the pandemic, public officials declared that the *only* way to prevent the spread of the virus was for everyone to stay home and away from each other. They ordered citizens to cease all public activities to the maximum possible extent—even the right to assemble to worship or to protest

*Id.* at 180-81 (Ho., J., concurring).

19. Then, he observed, "But circumstances have changed. In recent weeks, officials have not only tolerated protests—they have encouraged them . . . ." *Id.* at 181. And he posed a question:

> For people of faith demoralized by coercive shutdown policies, that raises a question: If officials are now exempting protesters, how can they justify continuing to restrict worshippers? **The answer is that they can't.** Government does not have carte blanche, even in a pandemic, to pick and choose which First Amendment rights are "open" and which remain "closed."

*Id.* (emphasis added).

20. Judge Ho noted that, "To survive First Amendment scrutiny, however, those orders must be applied consistently, not selectively. And it is hard to see how that rule is met here [in light] of the recent protests." *Id.* at 182.

21. He continued, "It is common knowledge, and easily proved, that protesters do not comply with social distancing requirements. But instead of enforcing the Governor's orders, officials are **encouraging the protests**—out of an admirable, if belated, respect for First Amendment rights." *Id.*

22.     As the Constitution demands, Justice Ho explained that: "If protests are exempt from social distancing requirements, then worship must be too." *Id.* (emphasis added).

23.     Of particular relevance to Plaintiffs' claims herein, Judge Ho cited a brief filed by the United States in another case against Governor Newsom in observing that "California's political leaders have expressed support for such peaceful protests and, from all appearances, have not required them to adhere to the now-operative 100-person limit . . . . **It could raise First Amendment concerns if California were to hold other protests to a different standard**." *Id.* (emphasis added). Indeed, the same principle Governor Newsom applies to protesters "**should apply to people of faith**." *Id.* (emphasis added).

24.     Much like the Governor here, "support for the protests reflects a commendable commitment to equality. But public officials cannot devalue people of faith while elevating certain protesters. That would offend the First Amendment—not to mention the principle of equality for which the protests stand." *Id.* at 183 (emphasis added).

25.     As Judge Ho stated, "The point here is that state and local officials gave [protesters] the choice," to ignore the prohibitions on gathering. *Id.* "Those officials took no action when protesters chose to ignore health experts and violate social distancing rules. **And that forbearance has consequences**." *Id.* (emphasis added).

26.     The consequences Judge Ho referred to are that,

> The First Amendment does not allow our leaders to decide which rights to honor and which to ignore. In law, as in life, what's good for the goose is good for the gander. **In these troubled times, nothing should unify the American people more than the**

**principle that freedom for me, but not for thee, has no place under our Constitution**.

*Id.* (emphasis added).

27.     Similarly, as recounted in *Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D.N.Y. June 26, 2020), the Governor of New York and the New York City Mayor openly encouraged protesters gathering in large numbers in New York, 2020 WL 3488742, *4–5, while continuing to prohibit in-person religious gatherings. *Id.* at *5-6.

28.     The Northern District of New York issued a preliminary injunction enjoining the enforcement of the "ever changing maximum number of people" for religious worship because the disparate treatment for protesters as compared to religious congregants in worship services violated the First Amendment. *Id.* at *8 ("[I]t is plain to this court that the broad limits of that executive latitude have been exceeded.").

29.     The court found that a restriction of 25% capacity for indoor worship services that is not applied equally to non-religious businesses and certainly not applied to protesters removes the law from general applicability and thus mandates strict scrutiny. *Id.* at *11.

30.     With respect to openly supporting protesters, rioters, and looters while imposing draconian restrictions on indoor religious worship services, the court noted that "Mayor de Blasio's simultaneous pro-protest/anti-religious gatherings message . . . clearly undermines the legitimacy of the proffered reason for what seems to be a clear exemption, no matter the reason." *Id.*, at *12.

31.     Indeed,

> Governor Cuomo and Mayor de Blasio could have just as easily
> discouraged protests, short of condemning their message, in the

12

name of public health and exercised discretion to suspend enforcement for public safety reasons instead of encouraging what they knew was a flagrant disregard of the outdoor limits and social distancing rules. They could have also been silent. **But, by acting as they did, Governor Cuomo and Mayor de Blasio sent a clear message that mass protests are deserving of special treatment.**

*Id.* at *12 (emphasis added).

32.    Because the government in New York treated protesters differently and more favorably than religious gatherings, the court held that such disparate treatment violated the Free Exercise Clause and issued a preliminary injunction. *Id.* at *13.

33.    The same result should obtain here. The Governor's orders impose disparately onerous prohibitions and numerical restrictions on religious gatherings in churches, and even on in-home Bible studies, worship meetings, and life groups. Moreover, the orders purport to dictate the manner in which Plaintiffs may engage in acceptable religious worship by prohibiting singing and chanting where indoor worship is allowed, and by allowing provision and receipt of approved social services by unlimited numbers in the same church buildings where religious worship services are limited numerically or prohibited altogether. And the Governor has imposed these draconian restrictions on Plaintiffs while openly celebrating and encouraging mass gatherings for protests. The Constitution demands more and so should this Court.

## **INTRODUCTION**

34.    Due to the unprecedented nature of COVID-19 and the health tragedy the disease has wrought on our great Republic and those victims suffering under its yoke, there are those who may find it "tempting to hold that First Amendment rights should acquiesce to national security in this instance." *Tobey v. Jones*, 706 F.3d 379, 393 (4th

Cir. 2013). One could be forgiven for hastily reaching such a conclusion in such uncertain times, but "our Forefather Benjamin Franklin warned against such a temptation by opining that those who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." *Id.*

35.     When the great American experiment was first implemented, our revered Founders took pains to note that the Constitution—and all of the rights it recognized and enshrined—was instituted "in order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." U.S. Const. Pmbl. (emphasis added). To this very day, "we continue to strive toward '[that] more perfect union.'" *Smith v. City of New Smyrna Beach*, No. 6:110cv01110-Orl-37KRS, 2013 WL 5230659, *1 (M.D. Fla. Sept. 16, 2013). That work is not easy, and governments can and sometimes do miss the mark. This is such a case.

36.     Recognizing that times of crisis would arise, that such times might lead governments to seek to repress precious freedoms, and that the Republic's survival depended upon defeating such repressive instincts, the genius of our founding document is that it placed explicit protections into the text of the Bill of Rights. And, importantly, "[o]ur Bill of Rights placed our survival on firmer ground—that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79 (1961) (Black, J., dissenting).

37.     During times of national crisis, such as the current uncertainty arising from COVID-19, "the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights." *American Communist Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950)

14

(Black, J., dissenting). But, where the fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Without doubt, "[t]herein lies the security of the Republic, the very foundation of constitutional government." *Id.*

38.     It is beyond cavil that our commitment to our founding principles is most tested and best calculated during times of crisis and uncertainty. Indeed, "[t]imes of crisis take the truest measure of our commitment to constitutional values. **Constitutional values are only as strong as our willingness to reaffirm them when they seem most costly to bear**." *Hartness v. Bush*, 919 F.2d 170, 181 (D.C. Cir. 1990) (Edwards, J., dissenting) (emphasis added). Our willingness to reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the American experiment. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. **But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike**." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring) (emphasis added).

39.     Plaintiffs bring this case to restrain the troubling transgression of their fundamental and cherished liberties wrought by the imposition of Governor Newsom's orders contrived from COVID-19. Plaintiffs seek not to discredit or discard the government's unquestionable interest in doing that task for which it was instituted—protecting the citizenry. But, as is often true in times of crisis, Plaintiffs respectfully submit that the Governor has transgressed a line the Constitution does not permit.

Because of that, Plaintiffs bring this action to ensure that this Court safeguards the cherished liberties for which so many have fought and died. For, "[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting) (emphasis added). Plaintiffs pray unto the Court that it not permit the cherished and fundamental liberties enshrined in the Constitution to be another tragic casualty of COVID-19.

## **PARTIES**

40.     Plaintiff HARVEST ROCK CHURCH, INC. ("Harvest Rock") is a domestic nonprofit corporation incorporated under the laws of the State of California with its principal place of business Pasadena, California, and with campuses in several other localities in California.

41.     Plaintiff HARVEST INTERNATIONAL MINISTRY, INC. ("Harvest International") is a domestic nonprofit corporation incorporated under the laws of the State of California with its principal place of business in Pasadena, California, and with 162 member churches in the State of California. Harvest International brings this action for itself and on behalf of its member churches in California.

42.     Defendant, GAVIN NEWSOM, is the Governor of California, with authority to sue and be sued, and is responsible for enacting and enforcing the COVID-19 executive orders and directives at issue in this litigation. The enforcement of the COVID-19 orders and directives is under the Governor's authority and under the direct supervision of the Governor's Office of Emergency Services. Governor Newsom is sued in his official capacity.

## JURISDICTION AND VENUE

43.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.

44.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

45.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, and pursuant to 28 U.S.C. § 1391(b)(3) because the Governor is subject to personal jurisdiction in this Court.

46.     This Court is authorized to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant TRO and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

47.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

### A.     PLAINTIFFS' CHURCHES AND THEIR RELIGIOUS MINISTRIES.

48.     Harvest Rock has numerous church campuses, including in Pasadena, Irvine, and Corona. Harvest Rock has and exercises sincere religious beliefs that it is to minister the Gospel of Jesus Christ to its members and attendees at its facilities, that it cannot fulfill its vital ministry and sincere religious beliefs without gathering together in person, and cannot effectively engage in its constitutionally protected free exercise of religion on the Internet.

49.     Harvest Rock has and exercises sincere religious beliefs that a Church is fundamentally a communal and associational body of Believers in Jesus Christ that must gather together in order to fulfill the vital requirements of scriptural commands. Put simply, Harvest Rock has and exercises sincere religious beliefs that failure to gather together in person for religious worship services in which its members and congregants may worship the Lord, receive biblical teaching, and minister to one another's needs is disobedience to the Lord for which they will be held divinely accountable.

50.     In fact, Harvest Rock has and exercises a sincere religious belief that failure to abide by Scripture's command that it gather its congregants together to worship the Lord is disobedience to the Lord for which its pastors will be held divinely accountable. Harvest Rock has and exercises sincere religious beliefs that it must adhere to all scriptural commands, and that failure to do so will result in the strictest of divine judgment for its pastors and leaders. *See Hebrews* 3:17; *James* 3:1.

51.     As part of its religious mission, Harvest Rock has a ministry at its church called the Hope Center, which is staffed by church leaders and volunteers. The Hope Center provides support for those with financial, familial, emotional, and spiritual needs in its communities. Harvest Rock has and exercises sincere religious beliefs that Scripture commands it to feed the hungry, give water to the thirsty, clothe the naked, house the homeless, and counsel the afflicted. All of these ministries have been impacted by the Governor's COVID-19 Orders.

52.     As part of the exercise of its sincerely held religious beliefs, Harvest Rock's Church campuses also have numerous Life Groups, which meet in the homes of members

of the Church to worship together, engage in Bible study, fellowship with one another, and minister to the needs of each other.

53.     Harvest Rock has and exercises sincere religious beliefs that it is to raise up disciples and launch reformers through families, for the purpose of advancing the Kingdom of God. Harvest Rock has and exercises a sincere religious belief that Life Groups are an essential way for the church to fulfill its mission and to foster a healthy, vibrant, and growing Church community such that its members can gather together to grow in the Lord, mature in their faith, and understand the Scriptures better.

54.     Harvest International has 162 member churches in California, and each of these churches has and exercises the sincere religious beliefs that the church is to minister the Gospel of Jesus Christ to its members and attendees at its facilities, that it cannot fulfill its vital ministry and sincere religious beliefs without gathering together in person, and that it cannot effectively engage in its constitutionally protected free exercise of religion on the Internet.

55.     Many of Harvest International's member churches in California have programs that provide food support for the hungry, financial and ministry support for those in need, and also biblical and social-service-type counseling for members of their communities throughout California. These churches also have and exercise sincere religious beliefs that Scripture commands them to feed the hungry, give water to the thirsty, clothe the naked, house the homeless, and counsel the afflicted. All of these ministries have been impacted by the Governor's COVID-19 orders.

56.     Many of Harvest International's member churches in California also have smaller groups that meet in the homes of their members to worship together, engage in Bible study, fellowship with one another, and minister to the needs of the group.

57.     Harvest International's member churches in California have and exercise sincere religious beliefs that a Church is fundamentally a communal and associational body of Believers in Jesus Christ that must gather together in order to fulfill the vital requirements of scriptural commands. Put simply, Harvest International's member churches in California have and exercise sincere religious beliefs that failure to gather together in person for religious worship services in which their members and congregants may worship the Lord, receive biblical teaching, and minister to one another's needs is disobedience to the Lord for which they will be held divinely accountable.

58.     In fact, Harvest International's member churches in California have and exercise a sincere religious belief that failure to abide by Scripture's command that they gather together to worship the Lord, is a sin for which their Pastors will be held divinely accountable. Harvest International's member churches in California have and exercise sincere religious beliefs that they must adhere to all scriptural commands, and that failure to do so will result in the strictest of divine judgment for their pastors and leaders. *See Hebrews* 3:17; *James* 3:1.

59.     Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to "sing to the LORD" and "[d]eclare his glory among the nations." *Psalm* 96:1–2 (ESV).

60.     Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to "make a joyful noise" to the Lord, *Psalm* 95:1 (ESV), through singing and chanting His praises.

61.     Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to "sing to the LORD as long as I live." *Psalm* 104:33 (ESV).

62.     Plaintiffs and their churches all have and exercise sincere religious beliefs that not only are they to sing to the Lord, also to "declare [His] name unto my brethren," and that "**in the midst of the church** will [they] sing praise" to the Lord. *Hebrews* 2:12 (KJV) (emphasis added).

63.     Plaintiffs and their churches all have and exercise sincere religious beliefs that, in the current times of trouble and distress, they are to sing to the Lord even more and to sing aloud to Him. *See Psalm* 59:16 (ESV) ("I will sing aloud of your steadfast love in the morning. For you have been to me a fortress and a refuge in the day of my distress.").

64.     Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to chant and shout to the Lord as well. *See Psalm* 33:3 (ESV) ("Sing to him a new song; play skillfully on the strings, **with loud shouts**." (emphasis added)).

65.     Plaintiffs and their churches all have and exercise sincere religious beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

**B.   GOVERNOR NEWSOM'S EXECUTIVE ORDERS AND CALIFORNIA PUBLIC HEALTH ORDERS.**

66.   On March 4, 2020 the Governor issued a Proclamation proclaiming a State of Emergency existed in California due to the COVID-19 disease. A true and correct copy of that Proclamation is attached hereto as **EXHIBIT A** and incorporated herein.

67.   On March 12, 2020 the Governor issued Executive Order N. 25-20, stating that all residents of California "are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures." A true and correct copy of Executive Order N. 25-20 is attached hereto as **EXHIBIT B** and incorporated herein.

68.   One week later, on March 19, 2020 the Director of the California Department of Public Health, at the direction of the Governor, issued an Order of the State Public Health Officer "order[ing] all individuals living in the State of California to stay home or at their residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." A true and correct copy of the March 19, 2020 Public Health Order (the "Stay-at-Home Order") is attached hereto as **EXHIBIT C** and incorporated herein.

69.   The Stay-at-Home Order became effective immediately and remains "in effect until further notice," and **is still in effect.**

70.   The "federal critical infrastructure sectors" adopted and incorporated into the Stay-at-Home Order as exempt from its stay-at-home requirements, allowing "Californians working in these 16 critical infrastructure sectors [to] continue their work," are the 16 critical infrastructure sectors identified by the U.S. Department of Homeland

Security Cybersecurity and Infrastructure Security Agency (CISA). A true and correct copy of CISA's current Guidance on the Essential Critical Infrastructure Workforce, Version 3.1 (the "CISA Guidance") is attached hereto as **EXHIBIT D** and incorporated herein.

71.     The businesses and operations included within the 16 expansive infrastructure categories exempted by the Stay-at-Home Order include (a) businesses providing food and groceries (such as Ralphs and Trader Joe's grocery stores, and Walmart and Costco "big-box" stores), (b) food manufacturing and warehousing, (c) organizations providing "food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals," (d) businesses providing construction materials and equipment (such as Home Depot and Lowe's warehouse stores), (e) e-commerce distribution facilities (such as Amazon.com facilities), (f) bank and financial processing and service centers (such as Wells Fargo and Chase centers), and (g) "radio, television, and media service" organizations (of any size), and a host of other exempted businesses and operations (of any size) where large numbers of individuals are permitted to gather for extended periods of time with unavoidable close contact.

72.     The Stay-at-Home Order imposes no numerical limitations on the persons working in or patronizing the exempted businesses and non-religious activities, and advises only "that they should at all times practice social distancing."

73.     The Stay-at-Home Order, however, does not permit people to leave their homes to conduct or attend religious worship services. Thus, upon its issuances, **the Stay-at-Home Order imposed a total prohibition on religious worship services,**

**including in-home worship services, regardless of the number attending and whether social distancing or other hygiene practices were followed**.

74.     Also on March 19, the Governor issued Executive Order N. 33-20 incorporating and putting the full power of the Governor's Office behind the Stay-at-Home Order, directing the Governor's Office of Emergency Services "to take necessary steps to ensure compliance" with the order, and giving notice to the public that the order is enforceable pursuant to California Government Code § 8665, which provides that violating the Governor's orders is a misdemeanor criminal offense punishable by up to a $1,000 fine, six months in jail, or both. A true and correct copy of Executive Order N. 33-20 is attached hereto **EXHIBIT E** and incorporated herein.

75.     On April 14, 2020 the Governor issued his Roadmap to Modify the Stay-at-Home Order, providing "California's 6 indicators" for beginning the process of reopening businesses and other entities in California. A true and correct copy of the Roadmap to Modify the Stay-at-Home Order (the "Roadmap") is attached hereto as **EXHIBIT F** and incorporated herein.

76.     The Roadmap's 6 indicators are (1) "The ability to monitor and protect our communities through testing, contact tracing, isolating, and supporting those who are positive or exposed;" (2) "The ability to prevent infection in people who are at risk for more severe COVID-19;" (3) "The ability of the hospital and health systems to handle surges;" (4) "The ability to develop therapeutics to meet the demand;" (5) "The ability for businesses, schools, and child care facilities to support physical distancing;" and (6) "The ability to determine when to reinstitute certain measures, such as the stay-at-home orders, if necessary."

77.     On April 28, 2020, pursuant to the Governor's Executive Order N. 33-20 ratifying the Stay-at-Home Order, the Governor released California's own "Essential Workforce" guidance document listing businesses and operations exempt from the Stay-at-Home Order as so-called "'Essential Critical Infrastructure Workers" to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." A true and correct copy of the Governor's "Essential Workforce Guidance" is attached hereto as **EXHIBIBT G** and incorporated herein.

78.     The Governor's Essential Workforce Guidance, like the previously adopted CISA Guidance, identifies expansive categories of businesses and non-religious activities exempted from the Stay-at-Home Order and allowed to remain open and operational. The Essential Workforce Guidance includes exempt categories similar to the CISA Guidance, such as (a) businesses providing food and groceries (such as Ralphs and Trader Joe's grocery stores, and Walmart and Costco "big-box" stores), (b) food manufacturing and warehousing, (c) organizations providing "food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals," (d) businesses providing construction materials and equipment (such as Home Depot and Lowe's warehouse stores), (e) e-commerce distribution facilities (such as Amazon.com facilities), (f) bank and financial processing and service centers (such as Wells Fargo and Chase centers), and (g) "radio, television, and media service" organizations (of any size), and also includes new categories not covered in the March 19 CISA Guidance, such as (h) "laundromats, laundry services, and dry cleaners," (i) law and accounting firms, real estate offices, and other professional services (of any size),

(j) businesses that produce, store, transport and distribute cannabis, and (k) workers supporting California's entertainment industry, studios, and other related entertainment establishments, and a host of other exempted businesses and non-religious activities (of any size) where large numbers of individuals are permitted to gather for extended periods of time with unavoidable close contact.

79.     The Governor's April 28 Essential Workforce Guidance also exempted, for the first time, "Clergy for essential support and faith-based services," but **imposed a unique qualifier on religious worship not applicable to other "Essential" services**, limiting "faith-based services" to those "that are **provided through streaming or other technologies** that support physical distancing and state public health guidelines."

80.     On May 7, 2020 the Public Health Director issued a new Public Health Order identifying four stages of reopening and authorizing the gradual movement from Stage 1 to Stage 2. A true and correct copy of the May 7 Public Health Order (the "Stage 2 Order") is attached hereto as **EXHIBIT H** and incorporated herein.

81.     The Stage 2 Order identified the following stages: (Stage 1) safety and preparation; (Stage 2) reopening of lower-risk workplaces and other spaces; (Stage 3) reopening of higher-risk workplaces and other spaces; and (Stage 4) easing of final restrictions leading to the end of the Stay-at-Home Order.

82.     The Stage 2 Order advised that "sectors, businesses, establishments, or activities that are permitted to open will be designated" on the California COVID-19 "Roadmap" website, on an ongoing basis. The Stage 2 re-openings designated on the Roadmap website include "retail, related logistics and manufacturing, office workplaces, limited personal services, outdoor museums, child care, and essential businesses . . . with

modifications." A true and correct copy of the Roadmap designations is attached hereto as **EXHIBIT I** and incorporated herein.

83.     The Stage 2 Order authorizes Californians to "leave their homes to work at, patronize, or otherwise engage with [the designated] businesses, establishments, or activities, subject only to "physical distancing, minimize[ing] their time outside of the home, and wash[ing] their hands frequently." The May 7 Stage 2 Order otherwise left in effect the Stay-at-Home Order prohibiting Californians from leaving their homes to attend religious worship services.

84.     On May 25, 2020 the Governor issued his Guidance for Places of Worship and Providers of Religious Services and Cultural Ceremonies. A true and correct copy of the "May 25 Worship Guidance" is attached hereto as **EXHIBIT J** and incorporated herein.

85.     For all places of worship, including Plaintiffs and their churches, the May 25 Worship Guidance authorizes resuming in-person religious worship services on the condition that attendance is limited to "25% of building capacity or a maximum of 100 attendees, whichever is lower" after "a county public health department's approval of religious services . . . within their jurisdictions."

86.     The May 25 Worship Guidance also imposed significant restrictions (some obligatory, some suggested) on places of worship, including temperature screenings upon entering a church, eye-protection and gloves for workers, face coverings for employees, volunteers, and attendees, posting signage throughout the facility to inform attendees of the face covering and glove requirements, discouraging use of shared items such as Scriptures and Hymnals, discontinuing use of offering plates, discouraging

handshakes or hugging of any kind, discontinuing singing, group recitation, and similar practices, and many other restrictions not imposed on "Essential" businesses and non-religious activities.

87.     On July 1, 2020 the Governor issued a revised Guidance for Places of Worship. A true and correct copy of the "July 1 Worship Guidance" is attached hereto as **EXHIBIT K** and incorporated herein.

88.     The July 1 Worship Guidance largely mirrored the May 25 Worship Guidance, but imposed **mandatory** requirements on places of worship that were merely suggested in the prior version.

89.     For example, the July 1 Worship Guidance states unequivocally: "**Places of worship must therefore discontinue singing and chanting activities and limit *indoor* attendance to 25% of building capacity or a maximum of 100 attendees**, whichever is lower." (Bold emphasis added). The July 1 Worship Guidance also restricts outdoor worship services by requiring, "[a]t a minimum, . . . strict physical distancing measures of a minimum of six feet between attendees from different households."

90.     Thus, the July 1 Worship Guidance imposes numerical and size restrictions on both indoor and outdoor worship which are not imposed on other "Essential" businesses and non-religious activities.

91.     On July 6, 2020 the Governor issued yet another revised Guidance for Places of Worship. A true and correct copy of the "July 6 Worship Guidance" is attached hereto as **EXHIBIT L** and incorporated herein.

92.     The July 6 Worship Guidance retained the mandatory numerical restrictions for indoor and outdoor worship, but changed the singing and chanting prohibition to apply only indoors.

93.     Each of the evolving Worship Guidance documents equated the COVID-19 risks at places of worship with the COVID-19 risks at "Essential" businesses and non-religious operations such as "food production, warehouses, meat processing plants, and grocery stores," all of which "Essential" entities are exempt from the unique numerical restrictions and other prohibitions imposed on the core activities of places of religious worship.

94.     On July 13, 2020, after permitting Plaintiffs and other houses of worship to reopen subject to the restrictions of the evolving Worship Guidance documents, **and subject to obtaining the approval of local officials who could tell them whether worship services were permissible at all**, the Governor announced that 30 counties in the State were being returned to Stage 1 and that in-person worship services would no longer be permitted in any of those counties.

95.     Also, on July 13, 2020, pursuant to the Governor's public announcement, the Public Health Officer issued a Public Health Order closing indoor operations throughout the state for businesses such as bars, pubs, breweries, and restaurants, and ordering the additional closure, in counties on the California Department of Public Health (CDPH) County Monitoring List, of "Gyms and Fitness Centers[,] **Places of Worship**[,] Protests[,] Offices for Non-Critical Infrastructure Sectors[,] Personal Care Services[,] Hair salons and barbershops[, and] Malls" (emphasis added). A true and correct copy of

29

the July 13 Public Health Order is attached hereto as **EXHIBIT M** and incorporated herein.

96.    The July 13 Public Health Order "shall remain in effect until [the Public Health Officer] determine[s] it is appropriate to modify the order," and it remains in effect.

97.    The now 32 California counties on the County Monitoring List currently subject to the enhanced closures of the July 13 Public Health Order, which closures include places of worship, are: Alameda, Colusa, Contra Costa, Fresno, Glenn, Imperial, Kings, Los Angeles, Madera, Marin, Merced, Monterey, Napa, Orange, Placer, Riverside, Sacramento, San Benito, San Bernardino, San Diego, San Joaquin, San Luis Obispo, Santa Barbara, Santa Clara, Solano, Sonoma, Stanislaus, Sutter, Tulare, Ventura, Yolo, and Yuba.

## C.    THE GOVERNOR'S ORDERs DISCRIMINATE BETWEEN *PERMISSIBLE* RELIGIOUS ACTIVITIES AND *IMPERMISSIBLE* RELIGIOUS WORSHIP IN THE SAME BUILDING.

98.    As alleged *supra*, the March 19 Stay-at-Home Order created expansive categories of businesses and activities wholly exempt from the Order's stay-at-home mandate, subject only to social distancing.

99.    These exempt activities include the provision of "food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals" from the CISA Guidance (EXHIBIT D, at 20), and the identically described provision of "food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals" from the Governor's additional Essential Workforce Guidance (EXHIBIT G, at 23).

100.   Thus, under the Governor's orders, Plaintiffs and their churches may provide food for the hungry, shelter for the homeless, counseling on unemployment benefits or other government assistance programs, family counseling, drug-addiction counseling, and any other social services for "necessities of life," and **may do so in their Church buildings, without numerical restrictions on volunteers or recipients, subject only to social distancing**.

101.   But, in counties where Plaintiffs' campus and member churches are still permitted to gather at all, if they are feeding, clothing, housing, or counseling 101 individuals (or over 25% of their building capacity), and at any point transition from providing material "necessities of life" through government-approved social services, to providing spiritual necessities of life—according to sincerely held religious beliefs—through government-prohibited religious worship services, **for the same people, in the same building,** the Governor's orders automatically apply, and Plaintiffs are subject to criminal penalties.

102.   For each of Plaintiffs' campus and member churches in California counties subject to total closure for worship under the July 13 Public Health Order, they are still exempt for feeding, counseling, and even housing overnight an unlimited number of materially needy people in the same room, but if a pastor preaches a sermon for the spiritually needy among them and invites them to participate by singing a hymn, the exempt service becomes a prohibited religious worship service subject to criminal penalties—no matter how many or how few participate in worship.

103.   The Governor's orders and their classifications of exempt businesses, activities, and services has established a system informing Plaintiffs and their churches

that certain activities in their buildings are perfectly permissible and not subject to any numerical limitation, but that any transition to other religious activities (*i.e.*, religious worship services) are prohibited and subject Plaintiffs and their member churches to criminal penalties.

### D. THE GOVERNOR PUBLICLY AND UNEQUIVOCALLY SUPPORTED MASS PROTEST GATHERINGS THAT VIOLATED HIS ORDERS WHILE SIMULTANEOUSLY CONDEMNING AND PROHIBITING RELIGIOUS WORSHIP SERVICES.

104.   On June 1, 2020, Governor Newsom held a news conference in which he expressed appreciation and gratitude for the thousands of protesters gathering in the streets in California in violation of his own orders. KTLA 5, *'You are right to feel wronged': Newsom responds to weekend violence*, YouTube (June 1, 2020), https://www.youtube.com/watch?v=va7rl5seIXQ). In that press conference, the Governor thanked the protesters, invoked God's blessing on them, and explicitly encouraged the protesters to continue to flout his orders: "Those that want to express themselves and have, **Thank You! God bless You. Keep doing it**." *Id.* (emphasis added).

105.   When asked about the dichotomous and disparate treatment of family, religious, or social gatherings and the often-violent protests in California, Governor Newsom has issued public statements stating that "people understand we have a Constitution, we have a right to free speech and we are all dealing with a moment in our Nation's history that is profound and pronounced," and issued further expressions of praise for the protesters flouting his orders. *See* Eric Ting, *Gavin Newsom asked to reconcile support for protests with new warnings on gatherings*, SFGate (July 2, 2020,

1:58 PM), https://www.sfgate.com/politics/article/Gavin-Newsom-protests-coronavirus-July-Fourth-ask-15383112.php.

106.   On May 30, 2020, Governor Newsom released an official statement praising and encouraging the protesters in California to continue to gather in large numbers despite their flagrant violations of his own Orders. *See Governor Newsom Statement on Demonstrations Across California and the Passing of Federal Officer*, Office of Governor Gavin Newsom (May 30, 2020), https://www.gov.ca.gov/2020/05/30/ governor-newsom-statement-on-demonstrations-across-california-and-the-passing-of-federal-officer/.

107.   Specifically, the Governor said, "we have seen **millions of people** lift up their voices in anger, rightfully outraged . . . . Every person who has raised their voice should be heard." He continued, "I want to thank all those . . . who exercised their right to protest peacefully."

108.   In discussing the protesters' gathering by the thousands in the streets of California, Governor Newsom "expressed sympathy and showed support for the protesters," noting that he encouraged the protesters to engage in their constitutionally protected speech to advocate for their point because "people have lost patience" and need to protest. *See* Dave McNary, *California Gov. Gavin Newsom Shows Support for George Floyd Protesters*, Variety (June 1, 2020, 4:03 PM), https://variety.com/2020/tv/news/ gov-newsom-sympathy-george-floyd-protests-1234622479/.

109.   On June 1, 2020, Governor Newsom explicitly stated that he wants to have the thousands of protesters continuing to gather in the streets of California, despite his orders, stating, "'your rage is real. **Express it so that we can hear it**.'" Maggie Angst,

*On fourth day of protests, Newsom tells demonstrators: "Your rage is real. Express it."*, The Mercury News (June 2, 2020, 3:53 AM), https://www.mercurynews.com/2020/06/01/trump-tells-governors-to-dominate-protesters-newsom-tells-them-you-matter-i-care/ (emphasis added).

110.   On June 5, 2020, the Governor not only continued his support for mass protests that continually disregard his orders, but said new standards should be applied for such protests. He continued his encouragement of willful violations of his orders by stating: "'Protesters have the right not to be harassed . . . . Protesters have the right to protest peacefully. Protesters have the right to do so without being arrested . . . ." Alexei Koseff, *Newsom calls for new protest policing standards in California, ban on carotid holds*, San Francisco Chronicle (June 5, 2020, 6:37 PM), https://www.sfchronicle.com/politics/article/Gavin-Newsom-calls-for-new-protest-policing-15320403.php.

111.   The Governor's calls for First Amendment activity to be permitted without threat of arrest did not apply to religious gatherings, such as Plaintiffs' worship services.

## E.   THE GOVERNOR'S UNEQUAL TREATMENT OF NON-RELIGIOUS GATHERINGS.

112.   On Sunday June 7, 2020 an estimated 100,000 protesters were permitted to gather in close proximity without any threat of criminal sanction for violating the Governor's orders.



*See* Samuel Braslow, *Black Lives Matter Estimates that as Many as 100,000 Protesters Gathered in Hollywood on Sunday*, Los Angeles Magazine (June 8, 2020), https://www.lamag.com/citythinkblog/hollywood-protest-sunday/.

113.   On July 12, 2020, just one day prior to the July 13 Public Health Order prohibiting Plaintiffs from holding any religious worship services in over 30 counties (including in small groups in their own homes), thousands of additional protesters gathered in Martinez, California without mention or threat of criminal sanction for blatantly violating the Governor's orders.



Bay City News, *Thousands March for Black Lives in Martinez Sunday*, Patch (July 12, 2020, 6:41 PM), https://patch.com/california/martinez/thousands-march-black-lives-martinez-sunday.

114.   On July 1, 2020, after the Governor had instructed people not to gather on July 4th, thousands of people again protested in Los Angeles and were not threatened with criminal sanctions for violation of the Governor's orders.



Zachary Evans, *L.A. Protests Draw Thousands Hours after Gov. Newsom Prohibited Fourth of July Gatherings*, National Review (July 2, 2020, 1:22 PM), https://www.nationalreview.com/news/l-a-protest-draws-thousands-hours-after-gov-newsom-l-a-protests-draw-thousands-hours-after-gov-newsom-prohibited-fourth-of-july-gatherings/.

115.   On June 1, 2020, nearly 15,000 people gathered to protest in Oakland, California, and the Governor neither threatened nor imposed criminal sanctions on such gatherings despite the flagrant violations of his orders.



Darwin BondGraham, *How 2 Oakland students got 15,000 people to march against police violence on Monday*, Berkeleyside (June 2, 2020, 12:18 PM), https://www.berkeleyside.com/2020/06/02/how-oakland-students-got-15000-people-to-march-against-police-violence-on-monday.

116. On June 4, 2020, thousands of additional protesters assembled in the streets of San Diego, and again no criminal sanctions were threatened or imposed despite the violation of the Governor's orders.

39



Staff, *Thousands March From Downtown to North Park in Latest George Floyd Protest*, OB Rag (June 4, 2020), https://obrag.org/2020/06/thousands-march-from-downtown-to-north-park-in-latest-george-floyd-protest/.

117.   On June 6, 2020, thousands of other protesters assembled in Sacramento, right outside the Governor's office, in blatant violation of the Governor's orders, and no criminal citations or threats were issued against them.



Sam Stanton, et al., *Sacramento unites for Black Lives Matters as thousands take to downtown streets*, Sacramento Bee (June 6, 2020, 6:28 PM), https://www.sacbee.com/news/local/article243339831.html.

118.   On June 6, 2020, thousands of protesters gathered again in the streets of San Diego in violation of the Governor's orders, and no criminal sanctions were threatened or imposed.



Cody Delaney & Zoë Meyers, *Photos: San Diego demonstrators raise their voices to protest police violence*, inewsource (June 8, 2020), https://inewsource.org/2020/06/08/photos-san-diego-protest-police-violence/.

## F.   PLAINTIFFS' CHURCHES HAVE COMPLIED AND WILL CONTINUE TO COMPLY WITH SOCIAL DISTANCING AND PERSONAL HYGIENE PROTOCOLS.

119.   Despite the countless instances of protesters' gathering by the thousands, engaging in shouting and loud singing and chanting, without social distancing, and without threat of criminal sanction, Plaintiffs' churches still face criminal penalties

despite their complying with social distancing and personal hygiene protocols wholly absent from the mass protests Governor Newsom encouraged, applauded, and blessed.

120.   Harvest Rock's Pasadena campus seats 1,250 people, and it has been allowing for worship services only the number of people that allows for effective social distancing. Harvest Rock requires everyone to wear a mask into the building, takes the temperature of everyone entering the building, and spaces its attendees to achieve proper social distancing. Harvest Rock also has its building and restrooms professionally sanitized after hosting each worship service.

121.   Harvest Rock's Orange County campus seats 350 people, and it has been allowing for worship services only the number of people that allows for effective social distancing. Harvest Rock requires everyone to wear a mask into the building, takes the temperature of everyone entering the building, and spaces its attendees to achieve proper social distancing. Harvest Rock also has its building and restrooms professionally sanitized after hosting each worship service.

122.   Harvest Rock's Los Angeles campus seats 80 people, and it has been allowing for worship services only the number of people that allows for effective social distancing. Harvest Rock requires everyone to wear a mask into the building, takes the temperature of everyone entering the building, and spaces its attendees to achieve proper social distancing. Harvest Rock also has its building and restrooms professionally sanitized after hosting each worship service.

123.   Harvest Rock's Corona campus seats 50 people, and it has been allowing for worship services only the number of people that allows for effective social distancing. Harvest Rock requires everyone to wear a mask into the building, takes the temperature

of everyone entering the building, and spaces its attendees to achieve proper social distancing. Harvest Rock also has its building and restrooms professionally sanitized after hosting each worship service.

124.   Harvest International's 162 member churches in California have also taken steps to engage in social distancing, limit the number of attendees, and perform enhanced sanitation and hygiene protocols for its worship services.

125.   Plaintiffs and their churches are committed to protecting their members and attendees, and surrounding communities, while engaging in their constitutionally protected rights to exercise their sincerely held religious not to forsake the assembling of themselves together, and Plaintiffs are committed to engaging in appropriate social distancing and enhanced sanitation for all of their worship services.

### G.   LESS RESTRICTIVE ALTERNATIVES ARE AVAILABLE TO THE GOVERNOR.

126.   Despite Governor Newsom's insistence that in-person religious gatherings of any number of people indoors cannot continue in most of California, or at the requisite capacity limitations in the counties where worship is still allowed provided no singing or chanting takes place, the Governor has failed to consider other, substantially less restrictive alternatives to the absolute prohibition and severe restrictions on religious gatherings.

127.   Like California, the State of Indiana has issued stay-at-home executive orders and required the closure of all so-called "non-essential" businesses without unnecessarily discriminating against religious gatherings. Governor Eric. J. Holcomb's Executive Order 20-08 declared that "[r]eligious facilities, entities and groups, and

religious gatherings" are essential and may continue to operate provided they follow appropriate social distancing and personal hygiene practices. A true and correct copy of Indiana's Executive Order 20-08 is attached hereto as **EXHIBIT N** and incorporated herein.

128.   The State of Alabama, in its final Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, issued April 3, 2020, exempts individuals attending religious worship services in person subject to certain requirements and permits "drive-in" worship services without limitation. A true and correct copy of the Alabama Order is attached hereto as **EXHIBIT O** and incorporated herein.

129.   The State of Arkansas has likewise exempted "places of worship" from its Executive Order 20-13 imposing restrictions to prevent the spread of COVID-19, provided that they engage in adequate social distancing and personal hygiene practices. A true and correct copy of the Arkansas Executive Order is attached hereto as **EXHIBIT P** and incorporated herein.

130.   The State of Connecticut has similarly shown that other, less restrictive alternatives are available. In Executive Order No. 7N, Governor Ned Lamont permitted religious services to continue to meet, but limited their in-person gatherings to 50 people, as opposed to the six-person limit applicable to other gatherings. A true and correct copy of the Connecticut Executive Order No. 7N is attached hereto as **EXHIBIT Q** and incorporated herein.

131.   The State of Ohio has likewise issued certain COVID-19 orders, including the Ohio Department of Health's Stay Safe Ohio Order. A true and correct copy of the

Ohio order is attached hereto as **EXHIBIT R** and incorporated herein. Ohio's order likewise states that the stay at home mandate "does not apply to religious facilities, entities and groups and religious gatherings."

132.   The State of Illinois, though initially one of the strictest states on religious gatherings, completely eliminated all restrictions on religious gatherings due to various lawsuits and challenges to its draconian measures. A true and correct copy of the Illinois Order removing all restrictions on religious worship is attached hereto as **EXHIBIT S** and incorporated herein.

133.   The State of Florida has issued stay-at-home executive orders and required the closure of all so-called "non-essential" businesses without unnecessarily discriminating against religious gatherings. On April 1, 2020, Florida Governor Ron DeSantis issued Executive Order 20-91, which included "religious services conducted in churches, synagogues, and houses of worship" as essential activities permitted to continue subject to social distancing and personal hygiene guidelines. A true and correct copy of Florida Executive Order 20-91 is attached hereto as **EXHIBIT T** and incorporated herein.

134.   The State of Arizona, in Executive Order 2020-18, classified "[e]ngaging in constitutionally protected activities such as speech and religion" as essential activities, subject to a flexible requirement that such engagement be "conducted in a manner that provides appropriate physical distancing to the extent feasible." The Arizona Attorney General, in Opinion I20-008, interpreted such essential activities clearly to include assembling for religious worship. True and correct copies of Arizona Executive Order

2020-18 and Arizona Attorney General Opinion I20 008 are attached hereto as **EXHIBIT U** and **EXHIBIT V**, respectively, and incorporated herein.

135.   The State of Texas has likewise issued certain COVID-19 orders, but has provided explicit protections to religious gatherings and issued directives outlining the protection for religious freedom, even in these times of uncertainty. A true and correct copy of the Texas Guidance for Houses of Worship is attached hereto as **EXHIBIT W** and incorporated herein. In that Guidance, Texas notes that religious assemblies and houses of worship are "essential services" and that in-person gatherings are permissible if social distancing and personal hygiene practices are followed.

136.   Numerous other states have similarly permitted religious gatherings to be treated equally with non-religious gatherings, and have exempted them altogether from the restrictions being placed on their constitutionally protected exercise of religion.

137.   As these other states have demonstrated, Governor Newsom can continue to pursue the State's objective of preventing the spread of COVID-19 without unnecessarily treating religious gatherings in a discriminatory manner, and the State has numerous other, less restrictive alternatives available to it to do so.

138.   Governor Newsom has neither tried without success nor considered and ruled out for good reason these less restrictive alternatives.

139.   Governor Newsom has constitutionally permissible alternatives available, but has failed to attempt to achieve the State's purported goals without unnecessarily interfering with constitutionally protected activities.

## H. IRREPRABLE INJURY TO PLAINTIFFS FROM THE GOVERNOR'S ORDERS AND SELECTIVE ENFORCEMENT.

140.   Despite being willing and capable of following all social distancing and personal hygiene protocols recommended by the CDC and specified in the Governor's orders, Plaintiffs have been explicitly targeted, singled out, and threatened with criminal sanction for participating in in-person religious gatherings when exempted "Essential" businesses and non-religious activities, and ostensibly prohibited mass protests with no social distancing whatsoever, may accommodate gatherings, crowds, and masses of people without numeric limitation, and without scrutiny or punishment by the government.

141.   As a result of the Governor's orders, and blatantly selective enforcement of his orders, Plaintiffs have suffered and are suffering irreparable injury from the weight and threat of criminal enforcement of the Governor's orders against their churches, pastors, and worship attendees for merely engaging in responsibly distanced and sanitized religious worship services in the counties where indoor religious worship services are completely prohibited.

142.   As a result of the Governor's orders, and blatantly selective enforcement of his orders, Plaintiffs have suffered and are suffering irreparable injury from the weight and threat of criminal enforcement of the Governor's orders against their churches, pastors, and worship attendees for merely engaging in responsibly distanced and sanitized religious worship services involving more than 100 people or 25% of each church's building capacity in the counties where indoor religious worship services are

permitted but numerically restricted, regardless of whether their church buildings can accommodate such higher numbers while maintaining distancing.

143.   As a result of the Governor's orders, and blatantly selective enforcement of his orders, Plaintiffs have suffered and are suffering irreparable injury from the weight and threat of criminal enforcement of the Governor's orders against their churches, pastors, and worship attendees for merely engaging in responsibly distanced and sanitized religious worship services involving singing or chanting in the counties where indoor religious worship services are permitted but singing and chanting are prohibited.

144.   As a result of the Governor's order, Plaintiffs have suffered and are suffering irreparable injury from being prohibited from engaging in their constitutionally protected rights of free exercise, assembly, and speech.

145.   As a result of the Governor's orders, Plaintiffs have suffered and are suffering irreparable injury from the infringement of their constitutionally protected right to be free from government hostility toward religion.

146.   As a result of the Governor's orders, Plaintiffs have suffered and are suffering irreparable injury from the infringement of their constitutionally protected rights to be free from excessive government entanglement with how Plaintiffs are permitted to engage in their religious exercise, what religious services Plaintiffs may offer to their members and the community, and what religious practices Plaintiffs may engage in during the worship services the Governor has permitted in certain counties in California.

147.   As a result of the Governor's orders, Plaintiffs have suffered and are suffering irreparable injury by the continuing threat of criminal sanctions against their

churches, pastors, and congregants for merely exercising their constitutionally protected freedoms.

148.   Due to the explicit threats of the Governor's orders, Plaintiffs have been forced to self-censor, cease their religious worship services, cease certain vital practices in their religious services, and violate their sincerely held religious beliefs.

149.   As a result of the Governor's orders, Plaintiffs have been forced to conduct their religious worship services (in counties where it is even permissible to have a worship service) in a manner prescribed by the government, which has told them how they may worship and prohibited them from singing and chanting which are a critical parts of Plaintiffs' religious exercise.

150.   As a result of the Governor's orders, Plaintiffs have been prohibited from engaging in the critical ministries of home group Bible studies and programs because the Governor's orders prohibit them from leaving their homes for such gatherings.

## I.   PLAINTIFFS' ATTEMPTS TO SECURE RELIEF WITHOUT JUDICIAL INTERVENTION WERE IGNORED AND FURTHER ATTEMPTS TO OBTAIN SUCH RELIEF WOULD BE FUTILE.

151.   On July 16, 2020, prior to the commencement of the instant action, Plaintiffs' counsel sent by e-mail a demand letter to Governor Newsom in which Plaintiffs' counsel demanded, by 12:00 P.M. on July 17, written confirmation that the Governor has withdrawn the prohibitions and restrictions on religious gatherings embodied in the Governor's orders, will allow individuals to attend religious worship services at Plaintiffs' churches on equal terms as Californians are allowed to work at and patronize "Essential" businesses and non-religious operations provided certain social distancing and personal hygiene practices are followed, will cease demanding Plaintiffs' churches

conform their worship services to only those activities the Governor has approved, and will cease enforcement of any church gathering ban against members or attendees of Plaintiffs' worship services. A true and correct copy of the demand letter is attached hereto as **EXHIBIT X**.

152.   The Governor responded to Plaintiffs' demand letter, through the Office of the California Attorney General, by letter dated July 17, 2020, in which the Governor refused to withdraw any of his current prohibitions or restrictions on indoor worship. A true and correct copy of the Governor's response is attached hereto as **EXHIBIT Y**.

153.   Governor Newsom's refusal to withdraw his discriminatory religious worship prohibitions and restrictions shows that Plaintiffs' irreparable injury to their constitutionally protected freedoms is ongoing.

154.   Governor Newsom's flat refusal to withdraw his discriminatory religious worship prohibitions and restrictions also shows that notice and an opportunity to respond to this lawsuit would be futile prior to **this Sunday's worship services** at Plaintiffs' churches, which must proceed, if at all, under the weight and threat of criminal enforcement of the Governor's orders against Plaintiffs' churches, pastors, and attendees absent a TRO from this Court.

## CONSTITUTIONAL CLAIMS
### COUNT 1 – THE GOVERNOR'S ORDERS VIOLATE PLAINTIFFS' RIGHTS TO FREE EXERCISE OF RELIGION UNDER THE FIRST AMENDMENT

155.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–154 above.

156.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiffs' rights to free exercise of religion.

157.   Plaintiffs have and exercise sincere religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

158.   Plaintiffs have and exercise sincere religious beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

159.   Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to "sing to the LORD" and "[d]eclare his glory among the nations." *Psalm* 96:1–2 (ESV).

160.   Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to "make a joyful noise" to the Lord, *Psalm* 95:1 (ESV), through singing and chanting His praises.

161.   Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to "sing to the LORD as long as I live." *Psalm* 104:33 (ESV).

162.   Plaintiffs and their churches all have and exercise sincere religious beliefs that not only are they to sing to the Lord, also to "declare [His] name unto my brethren," and that "**in the midst of the church** will [they] sing praise" to the Lord. *Hebrews* 2:12 (KJV) (emphasis added).

163.   Plaintiffs and their churches all have and exercise sincere religious beliefs that, in the current times of trouble and distress, they are to sing to the Lord even more and to sing aloud to Him. *See Psalm* 59:16 (ESV) ("I will sing aloud of your steadfast love in the morning. For you have been to me a fortress and a refuge in the day of my distress.").

164.   Plaintiffs and their churches all have and exercise sincere religious beliefs that they are to chant and shout to the Lord as well. *See Psalm* 33:3 (ESV) ("Sing to him a new song; play skillfully on the strings, **with loud shouts**." (emphasis added)).

165.   The Governor's orders, on their face and as applied, target Plaintiffs' sincerely held religious beliefs by prohibiting or numerically restricting religious gatherings, by prohibiting singing and chanting in counties where religious worship services are permitted, and by imposing government-mandated restrictions on the types of religious activity Plaintiffs may exercise in their own buildings.

166.   The Governor's orders, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the State's imposed value system.

167.   The Governor's orders, on their face and as applied, place Plaintiffs in an irresolvable conflict between compliance with the Governor's orders and their sincerely held religious beliefs.

168.   The Governor's orders, on their face and as applied, put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental teachings and tenets of Scripture concerning the assembling of believers.

169.   The Governor's orders, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of Plaintiffs.

170.   By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders are not neutral.

171.   By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders are not generally applicable.

172.   By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders create a system of individualized exemptions based upon the value the Governor places on religious and other activities being engaged in by residents of California.

173.   By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders create a religious gerrymander of based upon the value judgments of the Governor.

174.   By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders are not being generally applied within California.

175.   By permitting mass gatherings of thousands of protesters on more favorable terms than small religious gatherings comprising Plaintiffs' life groups and in-home Bible studies, the Governor has demonstrated that his orders impose substantially more burdensome restrictions on religious gatherings than on his approved non-religious gatherings.

176.   The Governor's orders, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

177.   By prohibiting Plaintiffs' Churches from gathering at all (in some counties), from gathering without adherence to certain numerical limitations (in other counties), and from engaging in certain religious activities that are not approved by the Governor, the Governor has imposed an unconscionable and unconstitutional burden on Plaintiffs' religious exercise according to their sincerely held beliefs.

178.   The State lacks a compelling, legitimate, or rational interest in the Governor's orders' application of different standards for churches and religious gatherings than those applicable to exempted businesses, non-religious entities, and protesters.

179.   The State lacks even a rational basis to impose disparate treatment on Plaintiffs' permissible services (such as feeding, clothing, housing, and providing other necessities of life without numerical limitation) and its impermissible religious worship services (such as singing, chanting, and gathering together indoors for worship services) that all occur in the same building.

180.   The Governor cannot claim a compelling, legitimate, or even rational interest in his orders when he has permitted and encouraged mass gatherings of thousands of

56

protesters to engage in the very activity he claims poses a massive danger to California if it takes place in Plaintiffs' churches, as that leaves an appreciable amount of purported damaged unrestricted.

181. Even if the Governor's orders were supported by a compelling, legitimate, or even rational interest, they are not the least restrictive means or otherwise narrowly tailored to accomplish the government's purported interest.

182. The Governor's orders, on their face and as applied, fail to accommodate Plaintiffs' religious exercise according to their sincerely held beliefs.

183. The Governor's orders, on their face and as applied, specifically target Plaintiffs' religious exercise according to their sincerely held beliefs and set up a system of individualized exemptions that permits certain other similarly situated businesses or non-religious entities to continue operations under certain guidelines while prohibiting religious gatherings, such as Plaintiffs' church and worship services, from operating with similar guidelines.

184. The Governor's orders also set up a system of individualized exemptions by specifically permitting protesters to gather in massive numbers (sometimes thousands) without threat of criminal sanction or penalty while imposing draconian prohibitions on religious gatherings in Plaintiffs' churches.

185. The Governor's orders, on their face and as applied, constitute an express and overt religious gerrymander.

186. The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

187.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for relief against the State as hereinafter set forth in their prayer for relief.

### COUNT II – THE GOVERNOR'S ORDERS VIOLATE PLAINTIFFS' RIGHTS TO PEACEABLE ASSEMBLY UNDER THE FIRST AMENDMENT

188.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–154 above.

189.   The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging the right of the people peaceably to assemble.

190.   The Governor's orders, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' right to assemble.

191.   The Governor's orders, on their face and as applied, unconstitutionally discriminate against Plaintiffs' assembly on the basis of viewpoint.

192.   The Governor's orders, on their face and as applied, unconstitutionally discriminate against Plaintiffs' assembly on the basis of content.

193.   By specifically permitting and encouraging protesters expressing particular content of a particular viewpoint while prohibiting the religious content of Plaintiffs' worship services, the Governor has discriminated against Plaintiffs' assembly on the basis of content and viewpoint.

194.   The State lacks a compelling, legitimate, or rational interest in the Governor's orders' application of differential standards for churches and religious

gatherings than those applicable to exempted businesses, non-religious entities, and protesters.

195.   The Governor's orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

196.   The Governor's orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest in the orders.

197.   The Governor's orders, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

198.   The Governor's orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected right to assemble.

199.   The Governor's orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Newsom and his designees, to apply or not apply the Governor's orders in a manner to restrict free assembly.

200.   The Governor's favorably disparate treatment of protesters who engaged in assemblies of thousands without criminal sanction and at the express encouragement of the Governor demonstrates that he has unbridled discretion to apply or not apply his orders as he sees fit.

201.   The Governor's orders, on their face and as applied, are underinclusive by limiting the gathering prohibitions and restrictions to only religious activities and other activities deemed not "Essential."

202.   The Governor's orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of Plaintiffs.

203.   On their face and as applied, the Governor's orders violate Plaintiffs' rights to free assembly and have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

204.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the State as hereinafter set forth in their prayer for relief.

### COUNT III – THE GOVERNOR'S ORDERS VIOLATE PLAINTIFFS' RIGHTS TO FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT

205.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–154 above.

206.   The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiffs' freedom of speech.

207.   The Governor's orders, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' right to free speech.

208.   The Governor's orders, on their face and as applied, unconstitutionally discriminate against Plaintiffs' speech on the basis of viewpoint.

209.   The Governor's orders, on their face and as applied, unconstitutionally discriminate against Plaintiffs' speech on the basis of content.

210.   By specifically permitting and encouraging protesters expressing particular content of a particular viewpoint while prohibiting the religious content of Plaintiffs' worship services, the Governor has unquestionably discriminated against Plaintiffs' speech on the basis of content and viewpoint.

211.   The State lacks a compelling, legitimate, or rational interest in the Governor's orders' application of differential standards for churches and religious gatherings than those applicable to exempted businesses, non-religious entities, and protesters.

212.   The Governor's orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

213.   The Governor's orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

214.   The Governor's orders, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

215.   The Governor's orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected right to free speech.

216.   The Governor's orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Governor Newsom and his designees, to apply or not apply the Governor's orders in a manner to restrict free speech.

217.   The Governor's favorably disparate treatment of protesters who engaged in assemblies of thousands without criminal sanction and at the express encouragement of the Governor demonstrates that he has unbridled discretion to apply or not apply his orders as he sees fit.

218.   The Governor's orders, on their face and as applied, are underinclusive by limiting the gathering prohibitions and restrictions to only religious activities and other activities deemed not "Essential."

219.   The Governor's orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free speech rights of Plaintiffs.

220.   On their face and as applied, the Governor's orders violate Plaintiffs' right to free speech and have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

221.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the State as hereinafter set forth in their prayer for relief.

## COUNT IV – THE GOVERNOR'S ORDERS VIOLATE PLAINTIFFS' RIGHTS UNDER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT

222.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–154 above.

223.   The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from establishing a religion.

224. The Establishment Clause also prohibits excessive government entanglement with religion.

225. The Establishment Clause also prohibits the government from showing hostility towards religion and prohibits showing favoritism towards one religious sect over another or between non-religion and religion.

226. The government-mandated prohibitions and restrictions on religious gatherings in the Governor's orders violates the Establishment Clause because the State of California thereby dictates the manner in which Christians and churches must worship or whether they may worship at all.

227. The Establishment Clause does not permit the State of California to dictate under penalty of criminal sanctions the manner, style, form, practices, or sacraments of religious worship and thereby impose its own version of religious worship on every church and citizen of the State.

228. The State, through Governor Newsom's Orders, is purporting to prescribe what shall be orthodox in matters of religious worship, and is thus running roughshod over the Establishment Clause. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, **religion**, or other matters of opinion or force citizens to confess by word or act their faith therein." (emphasis added)).

229. The Governor's prohibition on singing and chanting during a religious worship service is an impermissible prescription for what shall be orthodox in matters of worship and religious belief.

230.   The Governor's prohibition on in-home Bible studies, in-home life groups, and in-home worship services is an impermissible prescription for what shall be orthodox in matters of worship and religious belief. The Governor may not dictate how individuals gather together to worship the Lord, express their faith, minister to one another, and exercise their religious faith.

231.   The Governor's orders, on their face and as applied, display and permit government officials to display impermissible hostility towards religious gatherings.

232.   The Governor's orders, on their face and as applied, have permitted singing and chanting by mass gatherings of protesters while imposing a total ban on singing or chanting during religious worship services.

233.   The Governor's orders, on their face and as applied, impermissibly show favoritism towards certain non-religious gatherings, such as protests, over religious gatherings.

234.   The Governor's express statements of support and encouragement of protesters while imposing draconian prohibitions and restrictions on Plaintiffs' worship services demonstrates the unquestionable government hostility toward Plaintiffs' religious gatherings and worship services.

235.   The Governor's orders, on their face and as applied, violate the Establishment Clause because they excessively entangle the government with religion.

236.   By setting up a system of permissible religious activities in Plaintiffs' church buildings (providing food, shelter, clothing, or other necessities of life without numerical restriction) and impermissible religious activities in a worship service (gathering in any number or above a certain number for a service, singing, and chanting), the Governor

has excessively entangled California with religious beliefs, teachings, and doctrine on proper expressions of faith in worship.

237.   By setting up a system whereby thousands of individuals may gather to sing and chant in protest without threat of criminal sanction while smaller groups of religious adherents cannot gather to sing and chant as religious worship, whether in church or in in-home worship services, Bible studies, or life groups, the Governor has excessively entangled California with religious beliefs, teachings, and doctrine on proper expressions of faith.

238.   The Governor's orders, on their face and as applied, purport to inform religious adherents and believers how they may choose to worship, assemble together, or exercise their religious freedoms.

239.   The Governor's orders, on their face and as applied, purport to establish an acceptable method of religious practice and worship, place a numerical limitation on the scope of how such religious practice and worship may occur, and provide a government imprimatur for only certain forms of "permissible" worship.

240.   The Governor's orders, on their face and as applied, demonstrate overt hostility to religious practice and worship that does not conform to government sanctioned religious exercises.

241.   By explicitly and publicly stating his belief that it was impossible for protesters to stay home instead of marching together by the thousands while continuing to call religious gatherings non-essential and impermissible, the Governor has demonstrated hostility towards those religious adherents that believe it is impossible and sinful for them to forsake the assembling of themselves together for worship.

242.   The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

243.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the State as hereinafter set forth in their prayer for relief.

### COUNT V – THE GOVERNOR'S ORDERS VIOLATE PLAINTIFFS' RIGHTS TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

244.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–154 above.

245.   The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to equal protection under the law.

246.   The Governor's orders, on their face and as applied, are an unconstitutional abridgement of Plaintiffs' right to equal protection under the law, are not neutral, and specifically target Plaintiffs' and other religious gatherings for unequal treatment.

247.   The Governor's orders, on their face and as applied, are an unconstitutional abridgment of Plaintiffs' right to equal protection because they permit the State to treat Plaintiffs differently from other similarly situated businesses, non-religious entities, and protesters on the basis of the religious content and viewpoint of Plaintiffs' gatherings.

248.   The Governor's orders create a system of exempt categories that permit "Essential" businesses and activities, and protesters, to gather without restriction or threat

of criminal penalty while imposing disparate treatment on Plaintiffs' religious worship services.

249. By explicitly and publicly declaring support for mass gatherings of protesters in flagrant violation of his own orders and asking that hey continue, while at the same time imposing draconian prohibitions on Plaintiffs' religious worship services, the Governor has created a class of prohibited gatherings without any rational, legitimate, significant, or compelling interest.

250. The Governor's system of categories represents disparate treatment based upon classifications in violation equal protection.

251. The Governor's orders, on their face and as applied, impermissibly discriminate between certain non-religious gatherings and religious gatherings.

252. The State lacks a compelling, significant, legitimate, or rational interest in the Governor's orders' application of different standards for churches and religious gatherings from those applicable to exempted businesses, non-religious activities, and protesters.

253. The Governor's orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

254. The Governor's orders, on their face and as applied, do not have a rational basis.

255. The Governor's orders, on their face and as applied, are irrational and unjustifiable and impose irrational and unjustifiable restrictions on Plaintiffs' religious gatherings.

256.    The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

257.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for relief against the State as hereinafter set forth in their prayer for relief.

## COUNT VI – THE GOVERNOR'S ORDERS VIOLATE THE GUARANTEE CLAUSE OF ARTICLE IV, SECTION 4 OF THE UNITED STATES CONSTITUTION

258.    Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–154 above.

259.    Article IV, § 4 of the United States Constitution requires the United States to guarantee to every citizen in the nation a republican form of government.

260.    The Guarantee Clause's distinguishing feature is that the republican form of government it guarantees is the right of the people to choose their own governmental administration and pass their own laws.

261.    As interpreted by the federal judiciary and prominent scholars, the Guarantee Clause mandates that the federal government guarantee a form of government for all citizens in which supreme power resides in a body of citizens entitled to vote and exercised by elected officers responsible to such citizens.

262.    The Governor's orders' express, unilateral, and unequivocal exercises of purported executive authority over the constitutional rights of Plaintiffs deprive Plaintiffs of the right to select their own government administration, pass their own laws, and

maintain a government administration directly responsible to the people, including by laws that are enacted by the legislature in constitutional recognition of the separation of powers.

263. The impermissible exercise of exclusive and unaccountable executive authority—in perpetuity—violates the Guarantee Clause of the United States Constitution.

264. The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

265. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against the State as hereinafter set forth in their prayer for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. That the Court issue a temporary restraining order, restraining and enjoining Governor Newsom, all State officers, agents, employees, attorneys, and all other persons in active concert or participation with them, from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with the Governor's orders or any other future order to the extent any such order prohibits Plaintiffs' religious worship services and imposes prohibitions on singing, chanting, and other forms of worship in which such religious services may be conducted, or imposing any other restrictions on in-person worship services at Plaintiffs' churches if Plaintiffs meet the social distancing,

enhanced sanitization, and personal hygiene guidelines otherwise acceptable at so-called "Essential" businesses and operations. To be clear, Plaintiffs do not seek a complete exemption from social distancing or personal hygiene protocols which the Governor has effectively granted to mass gatherings of protesters, even though the Constitution demands equal treatment; rather, **Plaintiffs merely seek a TRO preventing Plaintiffs, their pastors, and their congregants from being subject to criminal sanctions for participating in indoor worship services this Sunday, or singing or chanting therein, during which Plaintiffs will implement social distancing and hygiene protections on an equal basis with permitted non-religious gatherings**.

B.     That the Court issue a preliminary injunction pending trial, and a permanent injunction upon judgment, restraining and enjoining Governor Newsom, all State officers, agents, employees, attorneys, and all other persons in active concert or participation with them, from enforcing the Governor's orders so that:

   i.     The State will not apply the Governor's orders in any manner as to infringe Plaintiffs constitutional rights by discriminating against their right to assembly, speech, free exercise of religion, equal protection, and all other constitutional rights outlined herein;

   ii.     The State will apply the Governor's orders in a manner that treats Plaintiffs' religious gatherings on equal terms as gatherings for or in so-called "Essential" businesses or non-religious activities that are not subject to the prohibitions in the Governor's orders;

   iii.     The State will permit religious gatherings so long as they comply with the same social distancing and personal hygiene recommendations pursuant to

which the State allows so-called "Essential" businesses and non-religious activities to accommodate gatherings of persons without numerical limit under the Governor's orders;

iv.     The State will permit Plaintiffs the opportunity to comport their behavior to any further limitations or restrictions that the State may impose in any future modification, revision, or amendment of the Governor's orders or similar legal directive;

v.     The State will cease threatening criminal violations against Plaintiffs' churches, pastors, and congregants; and

vii.     The State will not bring any criminal, public health, or other enforcement actions against Plaintiffs as threatened in the Governor's orders and public statements.

C.     That the Court enter a declaratory judgment declaring that the Governor's orders, both on their face and as applied, are unconstitutional under the United States Constitution, and further declaring that:

i.     The State has violated Plaintiffs rights to freedom of assembly by impermissibly prohibiting and restricting religious gatherings;

ii.     The State has violated Plaintiffs rights to freedom of speech by impermissibly prohibiting and restricting religious gatherings;

iii.     The State has violated Plaintiffs rights to free exercise of religion by impermissibly prohibiting and restricting religious gatherings, by substantially burdening their religious exercise according to their sincerely held beliefs, by applying gathering criteria that are neither neutral nor generally applicable as to

religious and non-religious gatherings, by establishing a religious gerrymander against religious worship gatherings, by establishing a system of individualized exemptions that exclude similarly situated non-religious gatherings from the prohibitions and restrictions applicable to Plaintiffs' religious worship gatherings, and by imposing government directives on the manner in which Plaintiffs may conduct religious worship services, such as prohibiting singing and chanting;

iv.     The State has violated Plaintiffs' rights to equal protection of the laws by impermissibly prohibiting religious gatherings, and by applying criteria that treats religious gatherings in a discriminatory and dissimilar manner as that applied to various non-religious gatherings and protesters, rioters, and looters;

v.     The State has violated the Establishment Clause by impermissibly demonstrating hostility towards religious gatherings and by impermissibly showing favoritism to certain non-religious gatherings, including mass protests; and

vi.     The Governor has violated the Guarantee Clause by impermissibly exercising executive authority in an unconstitutional manner.

D.     That the Court award Plaintiffs nominal damages for the violation of Plaintiffs' constitutional rights.

E.     That the Court adjudge, decree, and declare the rights and other legal relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

F.     That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order.

G.     That the Court declare Plaintiffs are prevailing parties and award Plaintiffs the reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988.

H.     That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully submitted,


/s/ Nicolai Cocis
Nicolai Cocis, CA Bar No. 204703
nic@cocislaw.com
Law Office of Nicolai Cocis
25026 Las Brisas Road
Murrieta, CA 92562
Phone/Facsimile: (951) 695-1400

/s/ Daniel J. Schmid
Mathew D. Staver*
court@LC.org
Horatio G. Mihet*
hmihet@LC.org
Roger K Gannam*
rganname@LC.org
Daniel J. Schmid*
dschmid@LC.org
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 328854
Phone: (407) 875-1776
Facsimile: (407) 875-0770

*Pro Hac Vice Admission Pending

*Attorneys for Plaintiffs*

## **VERIFICATION**

I, Che Ahn, am over the age of eighteen years and am the Pastor of Harvest Rock Church and President of Harvest International Ministries. The statements and allegations that pertain to me and/or Plaintiffs Harvest Rock Church or Harvest International Ministry or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of California, that the foregoing statements are true and correct to the best of my knowledge.

Dated:        July 16, 2020

/s/ Che Ahn
Che Ahn

74