Nicolai Cocis, CA Bar No. 204703
nic@cocislaw.com
Law Office of Nicolai Cocis
25026 Las Brisas Road
Murrieta, CA 92562
(951) 695-1400 (phone/facsimile)

Mathew D. Staver*
court@LC.org
Horatio G. Mihet*
hmihet@LC.org
Roger K. Gannam*
rgannam@LC.org
Daniel J. Schmid*
dschmid@LC.org
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770 (facsimile)
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

---

HARVEST ROCK CHURCH, INC., and
HARVEST INTERNATIONAL
MINISTRY, INC., itself and on behalf
of its member churches in California,

      *Plaintiffs*,

v.

GAVIN NEWSOM,
*in his official capacity as*
Governor of the State of California,

      *Defendant*.

Case No. 2:20-cv-06414

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARYINJUNCTION**

---

# **TABLE OF CONTENTS**

TABLE OF CONTENTS……………………………………………………...…………i

TABLE OF AUTHORITIES………………………………………………………………iii

URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER…………………..1

ARGUMENT………………………………………………………………...…………..2

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
      THEIR FIRST AMENDMENT FREE EXERCISE CLAIMS………………..……..3

      A.    The Governor's Encouragement And Public Advocacy For
            Protestors, Rioters, And Looters Gathering By The Thousands In
            Violation Of His Orders While Threatening Criminal Sanctions On
            Plaintiffs' Churches For Merely Hosting A Worship Service
            Violates The First Amendment………………………………….……...3

      B.    The Governor's Discriminatory Treatment Between Plaintiffs'
            *Permissible* Non-Religious Services And *Impermissible*
            Religious Worship Services Violates The FirstAmendment………………7

      C.    The Governor's Orders Must Satisfy Strict Scrutiny Because
            They Substantially Burden Plaintiffs' Religious Beliefs And Are
            Neither Neutral Nor Generally Applicable……………………..…………8

            1.    The Orders Substantially Burden Plaintiffs' Religious
                  Beliefs………………………………………………..……………9

            2.    The orders fail neutrality and general applicability because
                  prohibited worship is not more dangerous than permitted social
                  services at the same church or permitted shopping  or working
                  in "big box" or warehouse stores……………………………..……..10

            3.    The The orders fail neutrality and general applicability
                  because of the Governor's selective enforcement……………..……12

      D.    Substantial Precedent Arising From COVID-19 Challenges Holds
            That Worship Prohibitions Like the Governor's Orders
            Are Subject to Strict Scrutiny and Cannot Satisfy It …………………..……13

i

1.    *Roberts*, *First Pentecostal*, and *Berean Baptist* Demonstrate
The Constitutional Infirmity Of The Governor's Orders................13

2.    Several Other Cases Have Granted Similar Injunctions
Against Prohibitions On Religious Gatherings................…..........17

E.    The Governor's Orders Cannot Satisfy Strict Scrutiny................…..…........19

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
THEIR ESTABLISHMENT CLAUSE CLAIMS................................…...…21

III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
THEIR FREE SPEECH CLAIM................................................…..........22

A.    The Governor's Orders Are Content-Based Restrictions on
Speech................................................................…..22

B.    The Governor's Orders Cannot Satisfy Strict Scrutiny................…..…........24

IV.    PLAINTIFFS HAVE SUFFERED, ARE SUFFERING, AND WILL
CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT
INJUNCTIVE RELIEF................................................…...…..........24

V.    PLAINTIFFS SATISFY THE OTHER REQUIREMENTS FOR
INJUNCTIVE RELIEF................................................…...…..........24

CONCLUSION................................................…...…..........25

ii

# TABLE OF AUTHORITIES

## CASES

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)………………………….…………...25

*Ashcroft v. ACLU*, 542 U.S. 656 (2004)………………………………..…………...19

*Berean Baptist Church v. Cooper*, No. 4:20-cv-81-D,
2020 WL 2514313 (E.D.N.C. May 16, 2020)…………………...…………16, 17

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016)………………..…………….20

*Burson v. Freeman*, 504 U.S. 191, 200 (1992)……………………………..…………19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)………………………………………………….….…..……*passim*

*City of Boerne v. Flores*, 521 US. 507 (1997)……………………………….…………...19

*Elrod v. Burns*, 427 U.S. 347 (1976)…………………………..…………….24

*Emp't Div. v. Smith*, 494 U.S. 872 (1990)……………………………..…………14

*Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1 (1947)…………...…………..1, 21

*First Baptist Church. v. Kelly*, No. 20-1102-JWB,
2020 WL 1910021 (D. Kan. Apr. 18, 2020)…………………….……..….17, 18

*First Pentecostal Church v. City of Holly Springs, Miss.*,
959 F.3d 669 (5th Cir. 2020)…………………………………….……………13

*Gillette v. United States*, 401 U.S. 437 (1971)…………………..……………16, 21

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)…………………………………………..………………19

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011)…………..……………25

*Lund v. Rowan Cnty.*, 863 F.3d 268 (4th Cir. 2017)…………………………………21

*Machesky v. Bizzell*, 414 F.2d 283 (5th Cir. 1969)……………………….……………………25

*Maryville Baptist*, 957 F.3d 610 (6th Cir. 2020)…………………………….………....…9, 13

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014)………………………..…………………..19

*Network Auto, Inc. v. Adv. Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011)…………………………………..…………………3

*On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-cv-264-JRW,
2020 WL 1820249 (W.D. Ky. Apr. 11, 2020)……………………..……….…*passim*

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)……………………..……………22

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)……………………..………………20

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002)…………..……….………..19

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020)…………………..…………..*passim*

*Rodriguez v. Wolf*, No. 2:20-CV 01274,
2020 WL 1652541 (C.D. Cal. Feb. 10, 2020)……………………..……………22, 23

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989)……………….……………20

*Schneider v. New Jersey*, 308 U.S. 147 (1939)………………………..……………24

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991)…………………………………………………..……23

*Sindicato Puertorriqueno de Trabajjadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012)……………………………………….……………24

*Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS),
2020 WL 3488742 (N.D.N.Y. June 26, 2020)……………………..…………5, 6

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011)……………………..……………20

*Spell v. Edwards*, 962 F.3d 175 (5th Cir. 2020)……………………..…………*passim*

iv

*Thomas v. Rev. Bd. of Ind. Emp. Security Div.*,
450 U.S. 707 (1981)……………………………………….……………………...9

*United States v. Playboy Entm't Grp.*, 529 U.S. 803 (2000)……………….……………23

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)……………………….……..21

## **OTHER**

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,
*Federal Practice & Procedure* §2948.1 (2d ed. 1995)………………………….………24

**"Neither a state nor the Federal Government
can set up a church. . . . Neither can force nor influence
a person to go to or to remain away from church against his will."**
***Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947).**

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER <u>AND PRELIMINARY INJUNCTION</u>

Plaintiffs, HARVEST ROCK CHURCH, INC. and HARVEST INTERNATIONAL MINISTRY, INC., itself and on behalf of its member churches in California, submit this memorandum of law in support of their contemporaneously filed Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiffs also rely on the factual allegations of their contemporaneously filed Verified Complaint, which is incorporated herein, as their statement of facts in support of their motion. (V. Compl. ¶¶ 40–154.)

### <u>URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER</u>

In their Prayer for Relief (V. Compl. 69–73), Plaintiffs seek a temporary restraining order (TRO) and preliminary injunction restraining enforcement against Plaintiffs of the various COVID-19 orders issued by Governor Newsom and other State officials—

—**Prohibiting gathering for any indoor worship services in over 30 counties in California** (including those where many of Plaintiffs' churches are located) and, in the counties where indoor worship is not totally prohibited, prohibiting gathering for indoor worship with 101 or more individuals, or at over 25% capacity (whichever is lower);

—**Prohibiting singing or chanting during religious worship** in counties where indoor worship remains permissible;

—**Prohibiting gatherings inside private homes for small-group Bible studies** and worship services; and

1

—Imposing discriminatory and disparate prohibitions on the types of activities that Plaintiffs may engage in at their own church buildings, as the orders allow Plaintiffs to feed the hungry, clothe the naked, house the homeless, and provide other material social services to an unlimited number of individuals with unlimited volunteers in a single church building, but **the orders prohibit Plaintiffs from engaging in a religious worship service with the same individuals in the same church building, on pain of criminal penalties**. A TRO and preliminary injunction are necessary to protect these vitally important and constitutionally protected liberties, even in the midst of disease.

Additionally, while the Governor has unilaterally and significantly restricted the number of individuals permitted to "gather" in Plaintiffs' churches, he has imposed no similar restrictions on the untold thousands of protesters who have gathered all throughout California cities with no threat of criminal sanction, and no social distancing or restrictions whatsoever. And, **the Governor explicitly encouraged such large gatherings of protesters while condemning churches for signing hymns in their churches.**

The treatment being afforded to protesters engaging in mass gatherings (by the thousands) without threat of criminal sanctions, compared with the criminal penalties threatened against Plaintiffs' churches for gathering together for worship services, singing and chanting, or engaging in other religious activities is a violation of the First Amendment and must be enjoined. Plaintiffs seek emergency relief before **this Sunday's worship services** to prevent irreparable injury to their constitutional rights.

## ARGUMENT

To obtain a TRO and preliminary injunction, Plaintiffs must show they are likely to succeed on the merits, they will suffer irreparable harm absent injunctive relief, the

balance of the equities tips in their favor, and the public interest favors injunctive relief. *Network Auto, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1144  (9th Cir. 2011). The elements for a TRO and preliminary injunction are the same. *See Rodriguez v. Wolf*, No. 2:20-CV 01274, 2020 WL 1652541, *2 (C.D. Cal. Feb. 10, 2020).

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT FREE EXERCISE CLAIMS.

### A.   The Governor's Encouragement and Public Advocacy for Protesters Gathering by the Thousands in Violation of His Orders While Threatening Criminal Sanctions Against Plaintiffs' Churches for Merely Hosting a Worship Service Violates the First Amendment.

As demonstrated in Plaintiffs' Verified Complaint, Governor Newsom has not only refused to enforce his COVID-19 stay-at-home restrictions upon the thousands of protesters gathering throughout the state without penalty, he has openly encouraged them to do so. (V. Compl. ¶¶ 104–118.) The Governor's intentional and public preference for the speech and assembly activities of groups flouting every risk the Governor's orders are ostensibly aimed to curb, while continuing to scorn and even tighten restrictions on the religious exercise and assembly of Plaintiffs and other religious adherents, is simply unconstitutional. And courts are noticing that governments' open encouragement of protesters' violating COVID-19 gathering restrictions across the country while simultaneously prohibiting and restricting far smaller and less risky religious worship services violates of the First Amendment.

The constitutional incongruity of the Governor's encouragement of protesters while restricting worshippers was highlighted by Judge Ho's concurrence in *Spell v. Edwards*, 962 F.3d 175 (5th Cir. 2020), where the court dismissed as moot an appeal arising from a church's challenge to Louisiana's stay-at-home orders restricting worship services to 10 people. 962 F.3d at 177. Judge Ho first recounted,

> At the outset of the pandemic, public officials declared that the *only* way to prevent the spread of the virus was for everyone to stay home and away from each other. They ordered citizens to cease all public activities to the maximum possible extent—even the right to assemble to worship or to protest

*Id.* at 180-81 (Ho., J., concurring). Then, he observed, "But circumstances have changed. In recent weeks, officials have not only tolerated protests—they have encouraged them . . . ." *Id.* at 181.

> For people of faith demoralized by coercive shutdown policies, that raises a question: If officials are now exempting protesters, how can they justify continuing to restrict worshippers? **The answer is that they can't.** Government does not have carte blanche, even in a pandemic, to pick and choose which First Amendment rights are "open" and which remain "closed."

*Id.* (emphasis added).

Judge Ho noted, "To survive First Amendment scrutiny, however, those orders must be applied consistently, not selectively. And it is hard to see how that rule is met here [in light] of the recent protests." *Id.* at 182.  He continued, "It is common knowledge, and easily proved, that protesters do not comply with social distancing requirements. But instead of enforcing the Governor's orders, officials are **encouraging the protests**—out of an admirable, if belated, respect for First Amendment rights." *Id.* (emphasis added). That is equally true here, where thousands of protesters have gathered without even a hint of social distancing, yet the Governor publicly and unequivocally supported their flagrant violations of his orders. (V. Compl. ¶¶ 104–111). As the Constitution demands: "**If protests are exempt from social distancing requirements, then worship must be too.**" *Id.* (emphasis added).

Of particular relevance to Plaintiffs' claims herein, Judge Ho cited a brief filed by the United States in another case against Governor Newsom in observing that

4

"California's political leaders have expressed support for such peaceful protests and, from all appearances, have not required them to adhere to the now-operative 100-person limit . . . . **It could raise First Amendment concerns if California were to hold other protests to a different standard**." *Id.* (emphasis added). Indeed, the same principle Governor Newsom applies to protesters "**should apply to people of faith**." *Id.* (emphasis added). Much like the Governor here, "support for the protests reflects a commendable commitment to equality. **But public officials cannot devalue people of faith while elevating certain protesters**. **That would offend the First Amendment—not to mention the principle of equality for which the protests stand**." *Id.* at 183 (emphasis added).

As Judge Ho stated, "The point here is that state and local officials gave [protesters] the choice" to ignore the prohibitions on gathering. *Id.* "Those officials took no action when protesters chose to ignore health experts and violate social distancing rules. **And that forbearance has consequences**." *Id.* (emphasis added).

> The First Amendment does not allow our leaders to decide which rights to honor and which to ignore. In law, as in life, what's good for the goose is good for the gander. **In these troubled times, nothing should unify the American people more than the principle that freedom for me, but not for thee, has no place under our Constitution**.

*Id.* (emphasis added).

Similarly, as recounted in *Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D.N.Y. June 26, 2020), the Governor of New York and the New York City Mayor openly encouraged protesters gathering in large numbers in New York, 2020 WL 3488742, *4–5, while continuing to prohibit in-person religious gatherings. *Id.* at *5-6. The court issued a preliminary injunction enjoining the enforcement of the "ever

changing maximum number of people" for religious worship because the disparate treatment for protesters as compared to religious congregants in a worship service violated the First Amendment. *Id.*, at \*8 ("[I]t is plain to this court that the broad limits of that executive latitude have been exceeded."). The court found that a restriction of 25% capacity for indoor worship services that is not applied to protesters removes the law from generally applicability and thus mandates strict scrutiny. *Id.* at \*11.

With respect to openly supporting protesters while imposing draconian restrictions on indoor religious worship services, the court noted that "Mayor de Blasio's simultaneous pro-protest/anti-religious gatherings message . . . clearly undermines the legitimacy of the proffered reason for what seems to be a clear exemption, no matter the reason." *Id.* at \*12. Indeed,

> Governor Cuomo and Mayor de Blasio could have just as easily discouraged protests, short of condemning their message, in the name of public health and exercised discretion to suspend enforcement for public safety reasons instead of encouraging what they knew was a flagrant disregard of the outdoor limits and social distancing rules. They could have also been silent. **But, by acting as they did, Governor Cuomo and Mayor de Blasio sent a clear message that mass protests are deserving of special treatment.**

*Id.* at \*12 (emphasis added).

Because the government in New York treated protesters differently and more favorably than religious gatherings, the court held that such disparate treatment violated the Free Exercise Clause and issued a preliminary injunction. *Id.* at \*13.

The same result should obtain here. The Governor's orders impose disparately onerous prohibitions and numerical restrictions on religious gatherings in churches, and even on in-home Bible studies, worship meetings, and life groups. (V. Compl. ¶¶ 48–58, 73, 83–94.) Moreover, the orders purport to dictate the manner in which Plaintiffs may

6

engage in acceptable religious worship by prohibiting singing and chanting where indoor worship is allowed, and by allowing provision and receipt of approved social services by unlimited numbers in the same church buildings where religious worship services are limited numerically or prohibited altogether. (V. Compl. ¶¶ 71–73, 78, 98–103.) And the Governor has imposed these draconian restrictions on Plaintiffs while openly celebrating and encouraging mass gatherings for protests. (V. Compl. ¶¶ 104–111.) The Constitution demands more and so should this Court.

## B. The Governor's Discriminatory Treatment Between Plaintiffs' *Permissible* Non-Religious Services and *Impermissible* Religious Worship Services Violates the First Amendment.

As demonstrated in the Verified Complaint, the March 19 Stay-at-Home Order[1] created expansive categories of businesses and activities wholly exempt from the Order's stay-at-home mandate, subject only to social distancing. (V. Compl. ¶¶ 68–74, 77–78, EXS. C–E, G.) These exempt activities include the provision of "food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals." (V. Compl. ¶ 99, EX. D at 20, EX. G at 23.) Thus, under the Governor's orders, Plaintiffs and their churches may provide food for the hungry, shelter for the homeless, unemployment, family, or drug counseling, and any other social services for "necessities of life," and **may do so in their church buildings, without numerical restrictions on volunteers or recipients, subject only to social distancing**.

But, in counties where Plaintiffs' campus and member churches are still permitted to gather at all, if they are feeding, clothing, housing, or counseling 101 individuals (or over 25% of their building capacity), and at any point transition from providing material

---

[1]     Unless otherwise indicated capitalized terms used herein have the same meanings as in the Verified Complaint.

7

"necessities of life" through government-approved social services, to providing spiritual necessities of life—according to sincerely held religious beliefs—through government-prohibited religious worship services, **for the same people, in the same building,** the Governor's orders automatically apply, and Plaintiffs are subject to criminal penalties. (V. Compl. ¶¶ 84–92, 101.) And, for each of Plaintiffs' campus and member churches in California counties subject to total closure for worship under the July 13 Public Health Order, they are still exempt for feeding, counseling, and even housing overnight an unlimited number of materially needy people in the same room, but if a pastor preaches a sermon for the spiritually needy among them and invites them to participate by singing a hymn, the exempt service becomes a prohibited religious worship service subject to criminal penalties—no matter how many or how few participate in worship. (V. Compl. ¶¶ 94–97.)

The Governor's orders and their classifications of exempt businesses, activities, and services has established a system of disparate treatment between material social services and religious worship services offered in the same building to the same people. This disparate treatment, prohibiting and restricting Plaintiffs' religious worship services, substantially burdens Plaintiffs' exercise of religion according to their sincerely held beliefs and violates the First Amendment.

## C. The Governor's Orders Must Satisfy Strict Scrutiny Because They Substantially Burden Plaintiffs' Religious Exercise and Are Neither Neutral nor Generally Applicable.

The Governor's orders must be subjected to strict scrutiny under the First Amendment because they substantially burden Plaintiffs' religious exercise and are not neutral or generally applicable, and therefore "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of*

the *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) [hereinafter *Lukumi*].

### 1. The orders substantially burden Plaintiffs' religious exercise.

Plaintiffs have and exercise sincere beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that Christians are not to forsake assembling together, and that they are to do so even more in times of peril and crisis. (V. Compl. ¶¶ 48–54, 57–58, 65.) "[T]he Greek work translated church . . . literally means **assembly**." *On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249, at *8 (W.D. Ky. Apr. 11, 2020) [hereinafter, *On Fire*] (cleaned up) (emphasis added). And Plaintiffs also have and exercise sincere beliefs that obedience to Scripture requires them to sing as, and in, their worship of God. (V. Compl. ¶¶ 59–64.) Though the Governor might not view church worship services and singing as fundamental to Plaintiffs' religious exercise—or "Essential" like "big box" and warehouse store shopping, or more important than enforcement of his orders like mass protest gatherings—"religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Security Div.*, 450 U.S. 707, 714 (1981). The Governor's orders prohibiting or restricting Plaintiffs' religious worship services inside their churches, and prohibiting singing and chanting even where limited worship is allowed, on pain of criminal sanctions, unquestionably and substantially burdens Plaintiffs' exercise of religion according to their sincerely held beliefs. "The Governor's actions substantially burden the congregants' sincerely held religious practices—**and plainly so**. Religion motivates the worship services." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020) (emphasis added).

**2.    The orders fail neutrality and general applicability because prohibited worship is not more dangerous than permitted social services at the same church or permitted shopping or working in "big box" or warehouse stores.**

A law is not neutral "if the object of the law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Courts first look to the text, but "facial neutrality is not determinative. The Free Exercise Clause . . . extends beyond facial discrimination [and] forbids subtle departures from neutrality." *Id.* at 533–34 (cleaned up). The First Amendment prohibits hostility that is "masked, as well as overt." *Id.* The Governor's orders are not facially neutral, but even if so, they covertly or subtly depart from neutrality by treating Plaintiffs' religious gatherings differently from non-religious gatherings.

The orders fail neutrality and general applicability on facial examination because they expressly ban (33 counties and counting) or severely restrict the numbers and conduct at religious worship gatherings (capacity limits and singing prohibition), while expressly exempting a multitude of business and non-religious activities involving crowds that are no less risky (*e.g.*, shopping or working at "big box" and warehouse stores). (V. Compl. ¶¶ 66–97.) Exempted gatherings are permitted subject only to distancing, but religious worship is prohibited or severely restricted even if distancing and hygiene guidelines are followed religiously. Moreover, while **a church can gather at its own facility with no numerical limit to provide non-religious, social services approved by the Governor** (*e.g.*, food, shelter, counseling, etc.), **his orders prohibit the same church from conducting a religious worship service in its own facility under the same conditions, if at all.** (V. Compl. ¶¶ 98–103.) "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against

10

some or all religious beliefs or **regulates or prohibits conduct because it is undertaken for religious reasons**." *Lukumi*, 508 U.S. at 532 (emphasis added). Prohibiting Californians from joining others at a church for religious reasons, such as a worship service, while permitting them to join others at the same church for non-religious reasons, such as giving or receiving food, shelter, or counseling, "**violat[es] the Free Exercise Clause beyond all question**." *On Fire*, 2020 WL 1820249, at *6 (emphasis added).

Nor are the orders generally applicable on their face, for many of the same reasons they are not neutral. "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. To determine general applicability, courts focus on disparate treatment of similar conduct. *Lukumi*, 508 U.S. at 542. "All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* A law is not generally applicable where "inequality results" from the government's "decid[ing] that the governmental interests it seeks to advance are worthy of being pursued only against conduct with religious motivation." *Id.* at 543. Thus, a law "fall[s] well below the minimum standard necessary to protect First Amendment rights" when the government "**fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree**" than the prohibited religious conduct. *Id.* (emphasis added).

The Governor is utterly unable to demonstrate the difference in risk of spreading COVID-19, if any, as between a congregant who spends an hour at a socially-distanced worship service with a limited number of people (because of distancing), which is prohibited, and a shopper who spends an hour in a "big box" or warehouse store with unlimited other shoppers, which is allowed—the Governor certainly cannot demonstrate

the worship service is riskier. Nor can the Governor demonstrate Plaintiffs' socially-distanced worship services, standing in place for an hour or so at a time, once per week on a Sunday are riskier than any Walmart or Trader Joe's, working dozens of moving and stationary employees together for hours at a time, cycling hundreds or thousands of roving customers through the building, with no shopping time limit—touching carts, touching shelves, removing items from shelves and replacing them, following and passing within 6 feet of other customers, giving money to and receiving change from cashiers, touching point-of-sale machines—all day, 7 days a week. To be sure, **dozens, hundreds, or more employees can work at one time for one "Essential" business— *e.g.*, Amazon warehouses, Home Depots, Wells Fargo processing centers, etc.—in one building, for 8, 10, 12 or more hours at a time, 5, 6, or 7 days a week**, subject only to the orders' social distancing guidance. Neither logic nor common experience allows the conclusion that socially-distanced worship services pose more risk than the myriad "Essential" businesses and activities that are exempt from numerical limit under the orders. To be sure, the Governor's Worship Guidances all expressly equate the COVID-19 risks at places of worship with the risks at "Essential" businesses and non-religious operations such as "warehouses . . . and grocery stores," which are exempt from the unique numerical restrictions and other prohibitions imposed on the core activities of places of religious worship. (V. Compl. ¶ 93.)

### 3. The orders fail neutrality and general applicability because of the Governor's selective enforcement.

The orders also fail neutrality and general applicability as actually enforced, because the Governor has not applied the orders neutrally or generally. While Plaintiffs' churches are threatened with criminal punishment for increasingly restrictive

prohibitions on religious gathering, even singing, the Governor openly and publicly declared a *de facto* exemption for mass protest gatherings which clearly violate his orders but nonetheless have his unequivocal support. (V. Compl. ¶¶ 84–97, 104–118.) It is difficult to imagine a more selective and less neutral application of the Governor's orders. *See Soos*, *supra* Part I.A; *see also Spell*, 962 F.3d at 181 (Ho., J., concurring) ("If officials are now exempting protesters, how can they justify continuing to restrict worshippers? The answer is that they can't.")

**D.   Substantial Precedent Arising From COVID-19 Challenges Holds That Worship Prohibitions Like the Governor's Orders Are Subject to Strict Scrutiny and Cannot Satisfy It.**

**1.   *Roberts*, *First Pentecostal*, and *Berean Baptist* demonstrate the constitutional infirmity of the Governor's orders.**

Twice in two weeks the Sixth Circuit Court of Appeals enjoined enforcement of executive orders like the Governor's orders, determining that restrictions on drive-in **and in-person** worship services violated the First Amendment. *See Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (**in-person** worship services); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) (holding plaintiffs likely to succeed on merits of First Amendment and Kentucky RFRA claims for both drive-in and **in-person** services). Also, in *First Pentecostal Church v. City of Holly Springs, Miss.*, 959 F.3d 669 (5th Cir. 2020), the Fifth Circuit Court of Appeals granted an injunction pending appeal (IPA) to a Mississippi church, enjoining enforcement of that State's orders.

In *Roberts*, the Sixth Circuit granted an IPA enjoining the Kentucky Governor from enforcing executive orders prohibiting a church's in-person worship services when "serial exemptions for secular activities pose comparable public health risks." 958 F.3d at 414. In determining the plaintiffs' likely success on the merits of their free exercise

13

claims, the court recognized, "On one side of the line, a generally applicable law that incidentally burdens religious practice usually will be upheld." *Id.* at 413 (citing *Emp't Div. v. Smith*, 494 U.S. 872, 879–79 (1990)). But, the court concluded the Kentucky orders "likely fall on the prohibited side of the line," where "a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id.* (quoting *Lukumi*, 508 U.S. at 553).

> **Do the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws? We think so.** As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law. At some point, **an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny**.

*Id.* at 413–14 (cleaned up) (emphasis added).

"Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers." *Id.* at 414. Thus, the court rejected the Governor's suggestion "that the explanation for these groups of people to be in the same area—intentional worship—creates greater risks of contagion than groups of people, say, in an office setting or an airport," *id.* at 416, further explaining,

> the reason a group of people go to one place has nothing to do with it. Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there. So long as that is the case, why do the orders permit people who practice social distancing and good hygiene in one place but not another

14

> for similar lengths of time? It's not as if law firm office meetings and gatherings at airport terminals always take less time than worship services.

*Id.*

The *Roberts* court also rejected the notion that the Governor's orders were justified because congregants could simply worship online via Facebook, reasoning,

> Who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name," Matthew 18:20, or what it means when "not forsaking the assembling of ourselves together," Hebrews 10:25.

> [T]he Free Exercise Clause does not protect sympathetic religious practices alone. And that's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it.

*Id.* at 415 (citation omitted).

In awarding the injunction, the *Roberts* court brought into sharp relief the Kentucky Governor's disparate treatment of churchgoers under his orders:

> Keep in mind that the Church and its congregants just want to be treated equally. . . . They are willing to practice social distancing. They are willing to follow any hygiene requirements. . . . **The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same**.

> Come to think of it, aren't the two groups of people often the *same people*—going to work on one day and going to worship on another? **How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation, or at least the Governor has not provided one.**

*Id.* at 414 (emphasis added).

A week after the Sixth Circuit's *Roberts* decision, the Eastern District of North Carolina issued a TRO enjoining the North Carolina Governor from enforcing a 10-person limit on religious worship because it violated the Free Exercise Clause. *See Berean Baptist Church v. Cooper*, No. 4:20-cv-81-D, 2020 WL 2514313 (E.D.N.C. May 16, 2020) [hereinafter *Berean Baptist*]. In granting the TRO, the court noted upfront, "**There is no pandemic exception to the Constitution of the United States or the Free Exercise Clause of the First Amendment**." 2020 WL 2514313, at \*1 (emphasis added). The North Carolina "stay-at-home" orders challenged in *Berean Baptist* provided exemptions from their 10-person gathering limits for numerous "Essential Business and Operations." *Id.* at \*3. But, the North Carolina orders subjected worship services to a 10-person limit that was not imposed on any of the myriad "Essential" businesses and activities. 2020 WL 2514313, at \*4. The *Berean Baptist* court observed that the uniquely restrictive 10-person limit for worship gatherings "represent[s] precisely the sort of 'subtle departures from neutrality' that the Free Exercise Clause is designed to prevent." *Id.* at \*6 (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)).

The court observed further,

> Eleven men and women can stand side by side working indoors Monday through Friday at a hospital, at a plant, or at a package distribution center and be trusted to follow social distancing and hygiene guidance, but those same eleven men and women cannot be trusted to do the same when they worship inside together on Saturday or Sunday. "The distinction defies explanation . . . ."

*Id.* at \*8 (quoting *Roberts*, 958 F.3d at 414).

Thus, the court concluded, "These **glaring inconsistencies** between the treatment of religious entities and individuals and non-religious entities and individuals take [the orders] outside the 'safe harbor for generally applicable laws.'" *Id.* (quoting *Roberts*, 958

F.3d at 413).  Ultimately, in concluding the North Carolina orders could not pass strict scrutiny, the *Berean Baptist* court recognized that the plaintiffs "simply want the Governor to afford them the same treatment as they and their fellow non-religious citizens receive when they work at a plant, clean an office, ride a bus, shop at a store, or mourn someone they love at a funeral." *Id.* at *9 (citing *Lukumi*, 508 U.S. at 546 ("The proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree.")).

## 2.    Several other courts have granted similar injunctions against prohibitions on religious gatherings.

In Louisville, Kentucky, the government threatened to use police to impose criminal sanctions on individuals who went to church on Easter in violation of similar COVID-19 orders. The Western District of Kentucky held that the mere threat of such criminal sanctions warranted a TRO. See *On Fire*, 2020 WL 1820249. The *On Fire* TRO enjoined the Mayor of Louisville from "enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire." *Id.* at *1 (emphasis added).

The District of Kansas issued a TRO enjoining enforcement of a restriction on religious gatherings of more than 10 people, requiring the state to treat worship services the same as exempted "essential" gatherings. *See First Baptist Church. v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, *6–7 (D. Kan. Apr. 18, 2020) [hereinafter *First Baptist*]. The *First Baptist* TRO specifically stated that the government's disparate treatment of religious gatherings violated the Free Exercise Clause because it showed "**religious activities were specifically targeted for more onerous restrictions than comparable**

**secular activities**." *Id.* at \*7 (emphasis added). The court concluded that restricting religious gatherings while permitting other non-religious activities "show[s] that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral." *Id.* Indeed, "it goes without saying that the government **could not lawfully expressly prohibit individuals from meeting together for religious services**." *Id.* at \*6 (emphasis added).

The Eastern District of Kentucky issued a statewide TRO enjoining the Kentucky Governor from enforcing his prohibition on in-person religious gatherings. *See Tabernacle Baptist Church, Inc. of Nicholasville, Ky. v. Beshear*, No. 3:20-cv-00033-GFVT, 2020 WL 2305307, \*1, 6 (W.D. Ky. May 8, 2020). The court observed that the First Amendment does not "mean something different because society is desperate for a cure or prescription," *id.* at \*1, and that "'**even under *Jacobson*** [*v. Massachusetts*, 197 U.S. 11 (1905)], **constitutional rights still exist**.'" *Id.* at \*4 (quoting *On Fire*, 2020 WL 1820248, \*15 (emphasis added)). In fact, "while courts should refrain from second-guessing the efficacy of a state's chosen protective measures," a government very well may "'go so far beyond what was reasonably required for the safety of the public, as to authorize or **compel the courts to interfere**.'" *Tabernacle*, 2020 WL 2305307, at \*4 (quoting *Jacobson*, 197 U.S. at 28 (emphasis added)).

> It follows that the prohibition on **in-person** services should be enjoined . . . . There is ample scientific evidence that COVID-19 is exceptionally contagious. But evidence that the risk of contagion is heightened in a religious setting any more than a secular one is lacking. **If social distancing is good enough for Home Depot and Kroger, it is good enough for in-person religious services, which, unlike the foregoing,** *benefit from constitutional protection*.

*Tabernacle*, 2020 WL 2305307, at \*5 (emphasis added).

18

### E.     The Governor's Orders Cannot Satisfy Strict Scrutiny.

Because the Governor's discriminatory orders trigger strict scrutiny under the First Amendment (*see supra* Parts I.C, D), the Governor is subject to "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 US 507, 534 (1997), which is rarely passed. *See Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . ."). This is not that rare case.

To be sure, efforts to contain the spread of a deadly disease are "compelling interests of the highest order." *On Fire*, 2020 WL 1820249, at *7. But where the Governor permits tens of thousands of protesters to gather without numerical limitation all across California, the government's assertions of a compelling interest are substantially diminished. Put simply, the Governor's orders "cannot be regarded as protecting an interest of the highest order . . . **when [they] leave[] appreciable damage to that supposedly vital interest unprohibited**." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (emphasis added).

Whatever interest the Governor purports to claim, however, he cannot show the orders and their enforcement are narrowly tailored to be the least restrictive means of protecting that interest. And it is the Governor's burden to make the showing because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). "As the Government bears the burden of proof on the ultimate question of . . . constitutionality, **[Plaintiffs] must be deemed likely to prevail unless the Government has shown** that [their] proposed less restrictive alternatives are less effective than [the orders]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (emphasis added).

To meet this burden, the government must show it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). And the Governor cannot meet the burden by showing "simply that the chosen route is easier." *Id.* at 2540. Thus, the Governor "would have to show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added). Furthermore, "[i]t is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). "There must be a fit between the . . . ends and the means chosen to accomplish those ends." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 572 (2011) (cleaned up).

The Governor fails this test. The Governor has prohibited and severely restricted Plaintiffs' and others' religious worship services, while expansively exempting myriad "Essential" businesses and non-religious activities involving crowds of people, and openly supporting thousands of protesters continually gathering in blatant disregard of his orders. (V. Compl. ¶¶ 68–97, 104–118.) The Governor has not and cannot state why or how crowds and masses of thousands of protesters are any less "dangerous" to public health than a responsibly distanced and sanitized worship service, yet the Governor exempted the protesters and prohibited Plaintiffs' worship services. As Judge Ho said in his *Spell* concurrence, the Governor's decision "has consequences," 962 F.3d at 183, and the consequence here is that Governor Newsom's orders fail strict scrutiny and violate the First Amendment. The TRO should issue.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ESTABLISHMENT CLAUSE CLAIMS.

"**If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein**." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). Where, as here, Plaintiffs seek to be free from disparate treatment by the State, the very core of the Establishment Clause is at issue. "An attack founded on disparate treatment of "religious" claims invokes what is perhaps the central purpose of the Establishment Clause—**the purpose of ensuring governmental neutrality in matters of religion**." *Gillette v. United States*, 401 U.S. 437, 449 (1971) (emphasis added). Indeed, the Establishment Clause "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). That mandate of preventing hostility towards religions is equally present in times of exigent circumstances, such as COVID-19. For, as "[a]n instrument of social peace, **the Establishment Clause does not become less so when social rancor runs exceptionally high**." *Lund v. Rowan Cnty.*, 863 F.3d 268, 275 (4th Cir. 2017) (emphasis added). "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. . . . Neither can force nor influence a person to go to **or to remain away from church against his will**." *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947) (emphasis added).

Here, the Governor's orders have demonstrated official hostility towards religious worship by completely prohibiting it in 33 counties (and counting) and banning the core religious practices of singing and chanting in the counties where indoor worship is still

allowed, albeit severely restricted. (V. Compl. ¶¶ 84–97.) Moreover, the Governor's total worship ban includes gatherings of small groups for in-home Bible studies or worship. (V. Compl. ¶¶ 73, 94–97.) Violation of those orders is punishable by criminal citation, and Plaintiffs' pastors can be arrested for simply gathering their congregations for worship services. (V. Compl. ¶ 74.) Yet, no such criminal sanction or punishment has been threatened against the thousands of protesters continually gathering in flagrant disregard of the Governor's orders. (V. Compl. ¶¶ 104–118.) Such openly disparate treatment towards religious exercise constitutes official hostility towards religion in violation of the Establishment Clause.

## III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FREE SPEECH CLAIMS.

### A.  The Governor's Orders Are Content-Based Restrictions on Speech.

"Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (same). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. **Both distinctions are drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny**." *Reed*, 135 S. Ct. at 2227 (emphasis added). Put simply, the Supreme Court handed down a firm rule: **laws that are content based on their face must satisfy strict scrutiny**. *Id.*

Importantly, this firm rule mandating strict scrutiny of facially content-based restrictions of speech applies regardless of the government's alleged purpose in enacting

the law, even if the alleged purpose arises from a declared emergency. *See id.* ("On its face, the [law] is a content-based regulation of speech. **We thus have no need to consider the government's justifications or purposes for enacting the [law] to determine whether it is subject to strict scrutiny**.").

Thus, content-based laws must satisfy strict scrutiny, regardless of any purported justification the Governor may assert. *Reed*, 135 S. Ct. at 2229. "Because the [law] imposes content-based restrictions on speech, those provision can stand only if they survive strict scrutiny." *Id.* at 2231. **There are no exceptions to this rule**. Indeed, the notion that a content-based restriction on speech is presumptively unconstitutional is "so engrained in our First Amendment jurisprudence that last term we found it so 'obvious' as to not require explanation." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115–16 (1991). Furthermore, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000). The burden is on the Governor to prove his orders satisfy strict scrutiny, and he cannot.

Here, it is beyond cavil that the Governor's orders, both facially and as-applied, are content based. When it comes to the thousands of protesters openly violating his orders to share—shout, sing, and chant—their message, the Governor said "Thank you! God bless you. Keep doing it." (V. Compl. ¶ 104.) Yet, as the orders make plain, Plaintiffs' religious worship services, consisting of singing, chanting, and preaching—all speech— are completely prohibited or severely restricted. (V. Compl. ¶ 83–95.) When asked to explain this unconstitutional dichotomy, the Governor merely confirmed that some speech (protest) is "profound and pronounced" and must be supported and encouraged (V. Compl. ¶ 105), but other forms of expression—*religious* preaching, singing, and

chanting—at Plaintiffs' worship services is simply too dangerous to permit. (V. Compl. ¶#). The Governor's own statements prove his orders and their application are content-based speech restrictions and must satisfy strict scrutiny.

### B. The Governor's Orders Cannot Satisfy Strict Scrutiny.

As demonstrated in Part I.E, *supra*, the Governor's orders cannot satisfy strict scrutiny, and are therefore unconstitutional.

## IV. PLAINTIFFS HAVE SUFFERED, ARE SUFFERING, AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also* 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* §2948.1 (2d ed. 1995) ("When an alleged constitutional right is involved, most courts hold that **no further showing of irreparable injury is necessary**." (emphasis added)). Where, as here, Plaintiffs have made a sufficient showing of likely success on the merits, "irreparable injury is presumed." *Fortuno*, 699 F.3d at 11. Thus, demonstrating irreparable injury in this matter "**is not difficult. Protecting religious freedom was a vital part of our nation's founding, and it remains crucial today**." *On Fire*, 2020 WL 1820249, at *9 (emphasis added).

## V. PLAINTIFFS SATISFY THE OTHER REQUIREMENTS FOR INJUNCTIVE RELIEF.

A preliminary injunction enjoining enforcement of the Governor's orders prohibiting Plaintiffs' responsibly conducted worship services will impose no harm on the State, and will protect the very rights the Supreme Court has characterized as "lying at the foundation of a free government of free men." *Schneider v. New Jersey*, 308 U.S.

147, 151 (1939). Indeed, the State "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). But for Plaintiffs, as noted above, even minimal infringements upon First Amendment values constitute irreparable injury sufficient to justify injunctive relief. *Id.* at 302. As such, there is no comparison between the irreparable loss of First Amendment freedoms suffered by Plaintiffs here and the non-existent interest the State has in enforcing unconstitutional orders. Absent a TRO and preliminary injunction, Plaintiffs "face an impossible choice: skip [church] service[s] in violation of their sincere religious beliefs, or risk arrest, mandatory quarantine, or some other enforcement action for practicing those sincere religious beliefs." *On Fire*, 2020 WL 1820249, at *9. The balance favors injunctive relief.

Also, the public interest is served by a TRO and preliminary injunction. "Injunctions protecting First Amendment freedoms are always in the public interest." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (emphasis added). "First Amendment rights are not private rights of the appellants so much as they are rights of the general public. Those guarantees [are] for the benefit of all of us." *Machesky v. Bizzell*, 414 F.2d 283, 288–90 (5th Cir. 1969) (cleaned up). **"[T]he public has a profound interest in men and women of faith worshipping together [in church] in a manner consistent with their conscience**." *On Fire*, 2020 WL 1820249, at *9 (emphasis added).

## CONCLUSION

For the foregoing reasons, the TRO and preliminary injunction should issue.

25

Respectfully submitted,

/s/ Nicolai Cocis
Nicolai Cocis, CA Bar No. 204703
nic@cocislaw.com
Law Office of Nicolai Cocis
25026 Las Brisas Road
Murrieta, CA 92562
Phone/Facsimile: (951) 695-1400

/s/ Daniel J. Schmid
Mathew D. Staver*
court@LC.org
Horatio G. Mihet*
hmihet@LC.org
Roger K Gannam*
rganname@LC.org
Daniel J. Schmid*
dschmid@LC.org
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 328854
Phone: (407) 875-1776
Facsimile: (407) 875-0770

*Pro Hac Vice Admission Pending

*Attorneys for Plaintiffs*