UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-6414 JGB (KKx)** | Date | December 21, 2020 |
|---|---|---|---|
| Title | ***Harvest Rock Church, Inc. et al. v. Gavin Newsom*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **(IN CHAMBERS) Order (1) DENYING Plaintiffs' Emergency Motion for Temporary Restraining Order (Dkt. No. 58); (2) GRANTING South Bay United Pentecostal Church's Motion to File Amicus Brief (Dkt. No. 63); and (3) GRANTING Plaintiffs' Motion to Exceed Page Limitation (Dkt. No. 69).**

Before the Court are: Plaintiffs' Emergency Motion for a Temporary Restraining Order ("Motion," Dkt. No. 58; a request to file an amicus brief (Dkt. No. 63); and a Motion to Exceed Page Limitations (Dkt. No. 69). The Court held a telephonic hearing on the Motion on December 18, 2020. After considering the telephonic hearing along with the papers filed in support of and in opposition to the matter, the Court DENIES Plaintiffs' Motion.

## I.  BACKGROUND

On July 17, 2020, Plaintiffs Harvest Rock Church, Inc., and Harvest Rock International Ministry, Inc. filed a complaint against Defendant California Governor Gavin Newsom. ("Complaint," Dkt. No. 1.) The Complaint alleges six causes of action arising out of Governor Newsom's Covid-19 policy: (1) Violation of Free Exercise Clause of First Amendment to U.S. Constitution; (2) Violation of First Amendment Freedom of Assembly Clause; (3) Violation of Free Speech Clause of First Amendment to U.S. Constitution; (4) Violation of Establishment Clause of First Amendment to U.S. Constitution; (5) Violation of Equal Protection Clause of Fourteenth Amendment to U.S. Constitution; and (6) Violation of the Guarantee Clause of the U.S. Constitution. (Complaint.)

On July 18, 2020, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Dkt. No. 4.) On August 12, 2020, the Court held a telephonic hearing on the Motion for Preliminary Injunction. (Dkt. No. 42.) The Court orally denied the Motion at the haring and issued a separate written order to the same effect on September 2, 2020. (Dkt. No. 53.)

On August 21, 2020, Plaintiffs filed for an injunction pending appeal. (Dkt. No. 44.) The Court denied the injunction pending appeal on September 16, 2020. (Dkt. No. 54.)

On October 1, 2020, the Ninth Circuit held that Plaintiffs had not shown a likelihood of success on its argument that the Court abused its discretion by declining to grant its requested injunction. Harvest Rock Church, Inc. v. Newsom, 977 F.3d 728, 730 (9th Cir. 2020) (vacated).

On November 25, 2020, the Supreme Court granted emergency injunctive relief to petitioners in Roman Catholic Diocese of Brooklyn v. Cuomo, No. 20A87, 592 U.S. ___ (Nov. 25, 2020), a case concerning the constitutionality of New York State's Stay-at-Home orders.

On December 3, 2020, in light of its Catholic Diocese opinion, the Supreme Court vacated this Court's September 2, 2020 Order. Harvest Rock Church v. Newsom, No. 20A94, 592 U.S. ___ (Dec. 3, 2020). On instruction from the Supreme Court, the Ninth Circuit vacated its October 1, 2020 order and remanded the case to this Court for further consideration in light of Catholic Diocese. (Dkt. No. 57.)

The following day, Friday, December 4, 2020, Plaintiffs filed the instant Motion, once again requesting emergency injunctive relief. (Dkt. No. 58.) The Motion requested "immediate relief by this Sunday, December 6, 2020." (Id.) The Court scheduled hearing for Tuesday, December 8, 2020. (Dkt. No. 60.)

On December 5, 2020, Defendant filed a Notice of Intention to Oppose Plaintiffs' Motion and requested additional time to prepare an opposition and record. (Dkt. No. 61.) At the Tuesday, December 8, 2020 telephonic hearing, the Court granted Defendant's request for more time and set an expedited briefing schedule.

Also on December 8, 2020, South Bay United Pentecostal Church and Bishop Arthur Hodges III filed a motion to file an amicus brief in support of Plaintiffs. (Dkt. No. 63.) The Court GRANTS this request and considers the proposed amicus curiae brief properly submitted. (Dkt. No. 63-1.)

On December 14, 2020, Defendant opposed Plaintiffs' Motion. ("Opposition," Dkt. No. 66.) Accompanying the Opposition are the following:

- Declaration of Dr. James Watt ("Watt Declaration," Dkt. No. 66-1);
- Declaration of Dr. George Rutherford ("Rutherford Declaration," Dkt. No. 66-2);
- Declaration of Dr. Michael Stoto ("Stoto Declaration," Dkt. No. 66-3);

- Declaration of Todd Grabarsky ("Grabarsky Declaration," Dkt. No. 67).

On December 16, 2020, Plaintiffs replied. ("Reply," Dkt. No. 68). Accompanying the Reply are the following:

- Preliminary Injunction Opinion in <u>Burfitt v. Newsom</u> (Dkt. No. 68-1);
- Third Supplemental Declaration of Che Ahn (Dkt. No 68-2);
- Declaration of Daniel J. Schmidt (Dkt. No 68-3).

Also accompanying the Reply is a Motion to Exceed Page Limitations, (Dkt. No. 69,) which the Court GRANTS.

On December 18, 2020 Defendant filed objections to Plaintiff's Reply. (Dkt. No. 71.) The following day, Plaintiffs filed two Notices of Decision: <u>Calvary Chapel Lone Mountain v. Sisolak</u>, No.20-16274, 2020 WL 7364797 (9th Cir. Dec. 15, 2020) and <u>Midway Venture, LLC v. Cnty. of San Diego</u>, No. 37-2020-38194-CU-CR-CTl (2020). (Dkt. No. 72.)

On December 18, 2020, the Court held a telephonic hearing with argument from both Plaintiffs and Defendant.

## II.  CURRENT RESTRICTIONS

The set of policies governing Covid-19 closures in California exist under the umbrella designation "Blueprint for a Safer Economy," (the "Blueprint,") enacted August 28, 2020. (Dkt. No. 58-4.)  The Blueprint is a framework of risk tiers and sector-specific restrictions, applied and periodically adjusted county-by-county through the State.  (<u>Id.</u>)  Counties are assigned tiers ranging from "Tier 1-Widespread" to "Tier 4-Minimal" based on testing positivity and "case rate," defined as rate of new Covid-19 infection per capita, excluding prison cases, on a seven-day average.  (<u>Id.</u>)  The Blueprint has changed since its inception, but its overall framework remains essentially the same.  Also specifically governing religious activity in California is the State's July 29 Worship Guidance, which prohibits indoor singing and chanting for places of worship and requires the use of face coverings.[1]

Tier 1-Widespread restrictions are the most severe.[2]  In counties designated Tier 1, social gatherings (predominately but not exclusively secular) are only permitted outdoors and may only consist of up to three households.  (<u>Id.</u>)  Shopping centers may operate at a maximum of 25% capacity but must close common areas and food courts.  (<u>Id.</u>)  Museums, zoos, movie theaters, gyms, restaurants, wineries, cardrooms, and family entertainment centers (which include batting

---

[1] Covid-19 Industry Guidance: Places of Worship and Providers of Religious Services and Cultural Ceremonies, https://files.covid19.ca.gov/pdf/guidance-places-of-worship.pdf (last accessed December 6, 2020.)

[2] Grabarsky Declaration Exh. 7 (Blueprint for a Safer Economy: Activity and Business Tiers, "Blueprint").

cages and mini golf) are permissible outdoors only.  (Id.)  So too are places of worship.  (Id.)  Amusement parks and bars are closed.  (Id.)  Offices are designated "remote."  (Id.)  As of November 21, 2020, counties in Tier 1-Widespread are also subject to a curfew which directs people to stop "non-essential" activities between 10 p.m. and 5 a.m.  (Grabarsky Declaration Exh. 11.)

In Tier 2-Substantial, social gatherings are "strongly discouraged" but permitted indoors and may consist of up to three households.  (See Blueprint.)  Shopping centers are open and may operate at a maximum of 50% capacity but must close common areas and reduce the capacity of food courts.  (Id.)  Museums, zoos, and aquariums may open at a maximum of 25% capacity.  (Id.)  Gyms and fitness centers may open at a maximum of 10% capacity.  (Id.)  Restaurants, movie theaters, and places of worship may operate indoors at a maximum of 25% capacity or 100 people, whichever is fewer.  (Id.)  Wineries, cardrooms, and family entertainment centers are still outdoor-only.  (Id.)  Amusement parks and bars are still closed.  (Id.)  Offices are still designated "remote."  (Id.)

In Tier 3-Moderate, social gatherings are "strongly discouraged" but permitted indoors and may consist of up to three households.  (Id.)  Shopping centers may open with modifications but must close common areas and reduce the capacity of food courts.  (Id.)  Museums, zoos, and aquariums may open at a maximum of 50% capacity.  (Id.)  Gyms, cardrooms, and wineries may open at a maximum of 25% capacity.  (Id.)  Restaurants, movie theaters, and places of worship may operate indoors at a maximum of 50% capacity or 200 people, whichever is fewer.  (Id.)  Bars may open outdoors only.  (Id.)  Smaller amusement parks may open at 25% capacity or 500 people, whichever is fewer, for outdoor attractions and with in-county visitors only.  (Id.)  Offices may open indoors with modifications but should "encourage telework."  (Id.)

Regardless of tier, California permits "Critical Infrastructure" sectors to remain open with industry-specific modifications.[3]  Critical Infrastructure sectors include healthcare, emergency services, the food and agriculture supply chain, the energy sector, water and wastewater management, transportation, communications and information technology, critical manufacturing, financial services, chemical and hazardous materials, defense, and "industrial, commercial, residential, and sheltering facilities and services," which includes construction, plumbing, hardware, property management, laundromats, and homeless shelters.  (Id.)

As of December 3, 2020, layered on top of the Blueprint is a "Regional Stay Home Order," which goes into effect automatically the day after a region has been announced to have less than 15% availability in its Hospital Intensive Care Units (ICUs).  (Grabarsky Declaration Exh. 12.)  The Regional Stay Home Order prohibits all social gatherings with members of other households, including outdoor gatherings.  (Id.)  However, the Regional Stay Home Order permits outdoor worship consistent with Tier 1.  (Id.)  As of December 18, 2020, the Regional

---

[3] Essential Critical Infrastructure Workers, https://covid19.ca.gov/essential-workforce/ (last accessed December 6, 2020.)

Stay Home Order is in effect in all regions but Northern California.[4]  In Southern California, where Plaintiffs are based, ICU availability is at 0.0%.  (Id.)

### III.  LEGAL STANDARD

The Court has previously articulated relevant standards for Temporary Restraining Orders.  (See Dkt. Nos. 5, 42, 53.)  To repeat:

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).  The elements of a TRO and of a preliminary injunction are the same.  See Rodriguez v. Wolf, 2020 WL 1652541, *2 (C.D. Cal. Feb. 10, 2020.)

### IV.  DISCUSSION

Roman Catholic Diocese of Brooklyn v. Cuomo[5] is a Free Exercise opinion.  Accordingly, Plaintiffs' Motion mostly requests injunctive relief on Free Exercise grounds.  (Motion 6.)  However, Plaintiffs also argue that the Blueprint violates the Establishment Clause.  (Id. at 17.)

After this case was remanded, the Ninth Circuit found Nevada's Covid-19 religious restrictions unconstitutional in light of Catholic Diocese.[6]  In their Reply, Plaintiffs quote Dayton Valley: "The Supreme Court's recent decision in [Catholic Diocese] arguably represents a seismic shift in Free Exercise law, and compels the result in this case."  (Reply 1 (quoting 2020 WL 7350247 at *1).)

#### A.  Plaintiffs Remain Unlikely to Succeed on the Merits

##### 1.  Free Exercise Clause

The Free Exercise Clause of the First Amendment, incorporated through the Fourteenth Amendment, prohibits laws "prohibiting the free exercise" of religion.  U.S. Const., amend. I.  Claims brought under the Free Exercise Clause first face the threshold inquiry of whether a law that substantially burdens a plaintiff's religious exercise is "neutral or generally applicable."

---

[4] Regional Stay Home Order, https://covid19.ca.gov/stay-home-except-for-essential-needs/#regional-stay-home-order (last accessed December 18, 2020).

[5] Hereafter cited as No. 20A87, 2020 WL 6948354, at *1 (U.S. Nov. 25, 2020).

[6] Calvary Chapel Dayton Valley v. Sisolak, No. 20-16169, ___ F.3d. ___ (9th Cir. Dec. 15, 2020) (Hereafter cited as Dayton Valley v. Sisolak, 2020 WL 7350247 (9th Cir. Dec. 15, 2020)); see also Calvary Chapel Lone Mountain v. Sisolak, 2020 WL 7364797 (9th Cir. Dec. 15, 2020).

<u>Employment Div., Dep't of Human Res. of Oregon v. Smith</u>, 494 U.S. 872, 881 (1990).  If a law is neutral and of general applicability, that law "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 52 0, 531 (1993).  Absent neutrality or general applicability, that law faces strict scrutiny, which requires the government to demonstrate a compelling interest and that its means are narrowly tailored to meet that interest. 508 U.S. at 531-32.

   <u>Catholic Diocese</u> did not overrule <u>Smith</u>; it applied it.  In <u>Catholic Diocese</u>, the Supreme Court established that New York State's Order was: (1) not neutral or generally applicable; (2) unlikely to survive the merits of a strict scrutiny inquiry.  2020 WL 6948354, at *1.  Though the Ninth Circuit has labeled this a seismic shift, (<u>see</u> 2020 WL 7350247 at *1,) the standard this Court is bound to apply remains the framework from <u>Smith</u> and <u>Lukumi Babalu</u>.  Indeed, though the Ninth Circuit found that Nevada's Covid-19 restrictions on houses of worship warranted strict scrutiny and directed the district court to review its analysis of the directive accordingly, it did not recognize or articulate a standard for Free Exercise claims distinct from the <u>Smith</u> framework.

### a.  California's Restrictions Do Not Warrant Strict Scrutiny

   The law remains that courts must first assess whether a law is "neutral or generally applicable."  <u>Smith</u>, 494 U.S. at 881.  The Court finds that California's Blueprint is.  The Blueprint offers something the New York and Nevada Orders did not: the ability to legally congregate in unlimited numbers for worship—so long as that worship occurs outside.  In so doing, the Blueprint treats religious activity better than comparable secular activity and even better than essential services.  This is distinct from both the New York and Nevada restrictions and compels the conclusion that the Blueprint is neutral.

   As the Supreme Court described, the New York Order imposed "very severe restrictions" on religious services in areas classified as "red" or "orange" zones.  2020 WL 6948354, at *1.  In red zones, no more than 10 people were permitted to attend a religious service, and in orange zones, attendance was capped at 25.  <u>Id.</u>  The New York Orders made no exceptions for outdoor religious worship.  In holding that the New York Orders were entitled to strict scrutiny, the Supreme Court noted that New York's regulations "cannot be viewed as neutral because they single out houses of worship for especially harsh treatment."  <u>Id.</u>  This harsh treatment occurred in both red and orange zones.  In red zones, businesses like "acupuncture facilities, camp grounds, garages, . . . all plants manufacturing chemicals and microelectronics and all transportation facilities" could admit as many people as they wished while religious organizations were numerically capped at 10.  <u>Id.</u> at *2.  In orange zones, while religious institutions were strictly capped, even non-essential businesses were empowered to decide for themselves how many persons to admit.  <u>Id.</u>  The Court noted that "the maximum

attendance at a religious service could be tied to the size of the church or synagogue," and that almost all of the Diocese churches affected by the Orders could seat over 500 people. Id.[7]

In Nevada, Governor Sisolak's Directive prohibited "gatherings in groups of more than fifty people in any indoor or outdoor areas." Calvary Chapel Dayton Valley v. Sisolak, 2020 WL 4260438, at *1 (D. Nev. June 11, 2020), rev'd and remanded sub nom. Dayton Valley v. Sisolak, 2020 WL 7350247 (9th Cir. Dec. 15, 2020). The Nevada Directive limited movie theaters and churches to a maximum of 50 people but allowed casinos to reopen at 50% of their capacity. Id. As the average capacity of a casino far surpasses 100 people, Nevada's Directive created an environment where individuals could gather in large groups to gamble but not to attend a religious service, regardless of whether that service was inside or outside.

In applying Catholic Diocese to Dayton Valley, the Ninth Circuit noted that "instead of a fifty-person cap, the Directive could have, for example, imposed a limitation of 50% of fire-code capacity on houses of worship, like the limitation it imposed on retail stores and restaurants, and like the limitation the Nevada Gaming Control Board imposed on casinos." Dayton Valley, 2020 WL 7350247, at *4. Nevada denied churches the ability to be treated like casinos, which is not neutral, generally applicable regulation.

By contrast to both New York and Nevada, California treats houses of worship like or more favorably than similar secular institutions—so the Blueprint is not subject to strict scrutiny. There are no numerical limits on worship in California. Plaintiffs and other religious institutions located in Tier 1 may gather as many worshippers in person as they please for outdoor services. The same rules apply to theaters and restaurants. All are limited to outdoor-only service in Tier 1. (Blueprint.) Likewise, in Tier 2, churches, theatres, and restaurants are allowed unlimited outdoor services and indoor services at a maximum of 25% capacity or 100 people, whichever is fewer. (Id.) In Tier 3, those entities are allowed unlimited outdoor services and indoor services at a maximum of 50% capacity or 200 people, whichever is fewer. (Id.) Large amusement parks, for example Disneyland, are not allowed to open until Tier 4 because of the risk associated with gathering crowds from many households together. (Id.) Smaller amusement parks may not open until Tier 3. (Id.) This is the case even though amusement parks are by nature, outdoors.

California also restricts activities and businesses mentioned in Catholic Diocese. Overnight stays at campgrounds are prohibited in regions with limited Intensive Care Unit (ICU) capacity. (Grabarsky Declaration Exh. 12.) In such areas, including Southern California, which has no ICU beds left, all retailers are capped at 20% capacity and must follow strict guidance— unlike the unlimited gathering permissible in New York stores described by the Supreme Court.

---

[7] The challengers in Catholic Diocese were also entitled to strict scrutiny because of the strong showing that New York's restrictions impermissibly discriminated against religious communities. The Court first noted that statements made in connection with the rules "can be viewed as targeting the ultra-Orthodox [Jewish] community." 2020 WL 6948354, at *1 (internal quotations omitted.) There are no statements indicating religious animus here.

(Id.)  No hotel or lodging entity is permitted to accept out-of-state reservations for non-essential travel unless the reservation is for an entire quarantine period.  (Id.)

The Blueprint and Regional Stay Home Order regulate social gatherings—including outdoor gatherings—more stringently than they regulate both indoor and outdoor religious activity.  (Id., Blueprint.)  Outdoor social gatherings are barred entirely under the Regional Stay Home Order, and under regular Tier 1, outdoor gatherings of more than three households are prohibited.  (Id.)  In other words, in Tier 1 counties, four families may not gather together outdoors for a picnic, but they may gather together outdoors to attend a religious service.  In Pasadena, two people from separate households cannot gather together outside unless they are engaged in worship or political expression.  (Grabarsky Declaration Exh. 12.)  This is not the especially harsh treatment of New York State,[8] or the casino favoritism of Nevada.

### b.  Even Applying Strict Scrutiny, California's Restrictions Survive

The Court finds the Blueprint is likely to prevail.  Strict scrutiny requires governmental action to be narrowly tailored to serve a compelling state interest.  See Catholic Diocese, 2020 WL 6948354 at *2.

The State has a compelling interest in curbing the spread of what is now the "world's deadliest infectious disease."  (See Grabarsky Declaration Exh. 2-3.)  This has been acknowledged by both the Supreme Court and the Ninth Circuit.  See Dayton Valley v. Sisolak, 2020 WL 7350247, at *3; Catholic Diocese, 2020 WL 6948354, at *2.  Indeed, Covid-19 can cause severe disease and death in individuals of any age.  (Watt Declaration ¶ 22.)  Even those who are asymptomatic or suffer only mild illness may face serious long-term effects.  (Id. ¶ 23.)  There is no cure.  (Id. ¶ 24.)  The virus has killed almost 300,000 Americans, including more than 20,000 Californians, and despite the miraculous development of a vaccine, this number will continue to climb in the foreseeable future.  (See Grabarsky Declaration Exh. 2-3.)  Mass death will likely be accelerated by public need for healthcare beyond what the hospital system can bear—Intensive Care Unit (ICU) capacity is currently at less than 3% in Southern California.  (See Watt Declaration ¶ 93; Rutherford Declaration ¶¶ 69-70.)  As a consequence, all patients in need of ICU services, including those who do not have Covid-19, are at risk of not being able to receive intensive treatments necessary to save their lives.  (See Watt Declaration ¶¶ 96-97.)  A compelling interest in averting mass death is clear.  Waiting out the pandemic in search of herd immunity results in substantial preventable death.  (See Rutherford Declaration ¶ 89.)

California's Blueprint is also painstakingly tailored to address the risks of Covid-19 transmission specifically.  Again, Covid-19 is spread through airborne transmission from person to person—infectious droplets are expelled into the air when people with the virus cough, sneeze,

---

[8] Catholic Diocese specifically references South Bay United Pentecostal Church v. Newsom, 590 U.S. ____ (2020), a case concerning California's Blueprint, in relevant reasoning. See, e.g., 2020 WL 6948354, at *7 (Kavanaugh, J., concurring) (explaining New York restrictions were "much more severe" than California's).

speak, sing, or make other noises.  (Watt Declaration ¶¶ 27-29.)  These droplets can land in the mouths, noses, or eyes of people who are nearby or be inhaled into those people's lungs.  (Id.)  Droplets may also fall onto objects which others then touch, but this is presently not believed to be a common source of Covid-19 spread.  (Id.)  There is broad consensus that people who are not experiencing symptoms can still spread the Covid-19 virus.  (Id. ¶ 30.)  This means that even those who are feeling well may infect others.  This scientific knowledge—that the virus spreads by being carried from an infected person to others through the air, even when the infected person may not feel ill—is the foundation of all public health guidance about Covid-19.  This is why it is safer for individuals to be farther apart as opposed to closer together.  This is why outdoor gatherings are safer than indoor gatherings in well-ventilated spaces, which are in turn safer than indoor gatherings in poorly-ventilated spaces.  This is the science behind masks, which block respiratory droplets from being expelled when they are worn properly.  This is why singing and shouting, which expel more viral droplets, are riskier activities than sitting silently.

Viral load also matters.  Viral load is the number of viable viral particles per milliliter of oral or nasal secretions.  (Rutherford Declaration ¶ 36.)  People with higher viral loads are more infectious than those with lower viral loads.  (Id.)  Those with higher viral loads are more likely to die than those with lower viral loads.  (Id. ¶ 35.)  To simplify greatly, more of the virus is worse for people than less of the virus.  Illness is not a binary between "Covid present" and "Covid absent."

Scientific knowledge about the spread of Covid-19 has led to "broad consensus among public health professionals" that all of the following measures reduce the spread of coronavirus: "stay at home orders, physical distancing requirements, physical barriers where distancing is not possible, prohibiting/limiting high-risk gatherings and other high-risk activities (including singing and other activities involving increased exhalation force), and universal wearing of face coverings by all in public places."  (Rutherford Declaration ¶ 51.)

California has tailored its Blueprint restrictions to the specific mechanism of Covid-19 transmission: viral droplets which travel through the air from person to person.  Imagining other possible methods of viral transmission underscores the specificity of California's response.  For example, if Covid-19 were a sexually transmitted viral disease like HIV/AIDS, State mandates requiring people to cover their faces would do no good.  There would be no sense in attendance limits on churches or grocery stores.  As such, the Blueprint would fail a strict scrutiny analysis if it were enacted to prevent the spread of HIV.  Similarly, if Covid-19 were a bacterial disease spread through contaminated water like cholera, there would be no reason to prevent people from singing and chanting.  The Blueprint would fail a strict scrutiny analysis if it were enacted to prevent the spread of cholera.

But the restrictions on houses of worship at the core of this case are narrowly tailored to prevent the spread of Covid-19.  They are precisely focused on the method by which the virus is transmitted: viral droplets expelled into the air.  Of course, California cannot merely prohibit expelling viral droplets.  It must address scenarios likely to make people ill by their transmission.

California permits unlimited attendance at religious services so long as those services occur outdoors. Neither New York nor Nevada did so. As outdoor activity is safer than indoor activity, (see Watt Declaration ¶ 44,) this framework enables people to practice their faith in large groups in the context in which it may be safe to do so. The increased danger of transmission posed by on singing and chanting are similarly restricted. There is widespread scientific consensus that louder and more forceful vocal vocalization, such as singing and chanting, produces more airborne droplets than normal speech. (Id. ¶ 45.) The more people singing and chanting, the greater the likelihood that some of those people are infected with Covid-19 and can infect others. (Id.)

Comparing restrictions on houses of worship to similar secular activities proves their tailoring. Indoor professional sporting events and concerts can draw crowds many times larger than the capacity of single movie theater. Under the Blueprint, these events cannot open to live audiences in any tier, even though they fit in the same "substantive categorization" as theaters. (Rutherford Declaration ¶ 61.) Restaurants, which also gather people from different households and thus pose risk, are regulated like indoor worship. (Blueprint.) Tier 1 closes indoor dining and religious observance alike. Id.

Finally, comparing restrictions on houses of worship to so-called "essential services" effectively proves tailoring. Plaintiffs place much weight on essential services, noting that even in Tier 1, "food packaging and processing plants, laundromats, and warehouses are permitted to operate with no numerical or capacity restrictions." (Motion 9.) Plaintiffs also cite Judge O'Scannlain's observation that in counties where individuals are restricted from indoor worship, they may still "spend a day shopping in the mall, have their hair styled, get a manicure or pedicure, attend college classes, produce a television show or movie, participate in professional sports, wash their clothes at a laundromat, and even work in a meatpacking plant." (Reply 8 (quoting Harvest Rock Church, Inc. v. Newsom, 977 F.3d 728, 731 (9th Cir. 2020) (O'Scannlain, J., dissenting))).

First, many of these activities, for both safety and architectural reasons, must occur inside, making the outdoor access accorded to Plaintiffs and other houses of worship impossible. It would be incredibly odd for the government to demand all meat-packing warehouses bring their operations into the Pasadena sunshine to comply with Covid-19 best practices.

More critically, the activities that Plaintiffs identify as receiving more favorable treatment than indoor worship are safer than indoor worship. Dr. Rutherford, Dr. Watt, and Dr. Stoto each explain why. (Stoto Declaration ¶¶ 32-34; Rutherford Declaration ¶¶ 91-133; Watt Declaration ¶ 46.)

To summarize, indoor worship services "are an especially risky type of public gathering." (Watt Declaration ¶ 46.) Indoor services typically involve large groups of people coming together for the purpose of being together. (Rutherford Declaration ¶ 102.) Religious services commonly bring together individuals from different households who may know each other, making them more likely to interact. (Id.) Attendees at indoor worship services typically

assemble close together in one space, seated in a series of many rows (or pews) that are physically close together, making close proximity of many individuals highly likely. (Id.) Worship services typically last a minimum of one hour with congregants gathered in close proximity. (Id. ¶ 103.) Many services involve "substantial group singing and other group vocalization by those leading the services and those in the congregation" which "carry with them a potential for increased risk of transmission of the novel coronavirus." (Id. ¶ 104.) In many cases, buildings housing indoor worship services "are older and are not equipped with adequate methods of ventilation or air conditioning." (Id. ¶ 105.) Risk in such settings is "reduced but not eliminated where all of the participants wear face coverings." (Id. ¶ 106.) Because of these characteristics, there have been many documented super-spreading incidents involving indoor religious activity. (Id. ¶ 108; Watt Declaration ¶ 46.)

In contrast, shopping at a grocery or big box store "involves less risk" of Covid-19 transmission than attending an indoor worship service. (Rutherford Declaration ¶ 113.) Grocery shoppers generally do not get or stay in close proximity to one another, generally intend to "get in and get out as soon as possible," and it is unlikely that two shoppers are ever within six feet of each other for more than 15 minutes, making it less likely that shoppers "receive a sufficient viral load of droplets or aerosolized particles sufficient to overcome their defenses and cause a COVID 19 infection." (Id.) Grocery stores are also generally larger in size, of more recent construction, and better ventilated than houses of worship, and they are "almost always equipped with high-functioning air-conditioning systems, as is required due to the necessity to preserve perishable products sold in these stores and the applicable building and health and safety codes." (Id. ¶ 114.) Grocery stores do not commonly invite singing. (Id. ¶ 116.)

Likewise, retail shopping centers, hotels, laundromats, and liquor stores pose a lower risk of transmission than indoor religious gatherings. "Staying at a hotel, doing laundry at a laundromat and retail shopping may bring people into relative closeness, but none of these activities would require them to remain in proximity for longer than a brief interlude." (Id. ¶ 117.) Because viral load matters, standing next to someone infected with Covid-19 for fifteen minutes is much less dangerous than standing next to someone infected with Covid-19 for one hour.

Personal care services are distinct for different reasons. Hair and nail salons and other personal services ordinarily involve much smaller groups of people than worship services. (Id. ¶ 120.) And under the Blueprint, workers at such businesses are "subject to numerous specific hygiene requirements, including requiring the use of face coverings by both workers and customers/clients, frequent handwashing, frequent cleaning and disinfection and the use of disposable gloves. Workers that are consistently within six feet of customers or co-workers are required to wear a secondary barrier (e.g., a face shield or safety goggles) in addition to a face covering." (Id.)

Congregate workplace settings such as warehouses, factories, and film production companies are also distinct. (Id. ¶ 121.) These workspaces are closed systems in which employers can determine who is allowed "in the bubble." Warehouses and factories do not

involve people in close proximity to others for extended periods of time; and they do not typically involve extended vocalizations. As for film production companies, employment in the entertainment industry is currently contingent on a negative Covid-19 test result, with subsequent testing up to three times a week depending on an employee's position. See COVID-19 Return to Work Agreement with DGA, IATSE, SAG-AFTRA and Teamsters/Basic Crafts (Sept. 21, 2020), at pp. 4–12 (describing testing requirements), available at https://www.sagaftra.org/files/sa_documents/ReturnToWorkAgreement_wAMPTP.pdf (last visited December 17, 2020).

If "narrowly tailored" does not mean based on the specific mechanism of Covid-19 infection with sliding levels of restriction based on scientific likelihood of viral spread in any given scenario, it means nothing. California's Blueprint regulations track levels of risk that infectious airborne droplets will enter the eyes, noses, and mouths of previously uninfected individuals, just as public health experts have advised.

Both the Supreme Court and the Court of Appeals have counseled that judges "are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area." Dayton Valley, 2020 WL 7350247, at *3 (quoting Catholic Diocese, 2020 WL 6948354, at *3.) This Court agrees. And respecting the judgment of experts means understanding which activities pose greater or lesser risks and allowing the State to regulate accordingly. (See, e.g., Stoto Declaration ¶ 34, "Rather than comparing the risks associated with attending church services and participating in protests, a more appropriate comparison would be between places of worship and movie theaters, which are treated identically in the Blueprint. Indeed, because movie viewers sit in one place during the entire performance, do not remove masks to receive communion, and do not sing or chant, the risk of transmitting the virus to others is probably lower than in church services.") The California Blueprint survives strict scrutiny.

## 2. Establishment Clause

Plaintiffs remain unlikely to succeed on the merits of their Establishment Clause claim. (Motion 17.) Neither Catholic Diocese nor Dayton Valley addressed the Establishment Clause; there is no basis to believe the Clause has changed to become salient here.

The Establishment Clause of the First Amendment prohibits laws "respecting an establishment of religion." U.S. Const., amend. I. At least for now, in assessing Establishment Clause claims, courts must examine the purposes and effects of a challenged government action, as well as any entanglement with religion that it might entail. See Lemon v. Kurtzman, 403 U. S. 602, 612–613 (1971). This analysis has involved challenges ranging from prayer in public schools to Sunday closing laws to religious monuments on public lands. See Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2080 (2019) (collecting cases).

However, the "real object" of the Establishment Clause is "to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government." Lynch v. Donnelly, 465 U.S. 668, 678 (1984) (quoting 3 Story,

Commentaries on the Constitution of the United States 728 (1833)).  Restrictions on religious activity which are the same as restrictions on secular activity do not constitute government establishment—or disavowal—of religion.  Even the broadest possible understanding of this clause does not render the State of California's Blueprint unconstitutional.

## B.  Irreparable Harm

Plaintiffs' harm is distinct from harm faced by challengers in <u>Catholic Diocese</u>.  While the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," <u>see</u> <u>Elrod v. Burns</u>, 427 U. S. 347, 373 (1976) (plurality opinion), Plaintiffs here have the ability to gather and worship in person and in unlimited numbers.

If there is unique irreparable harm arising from being made to gather for worship outside as opposed to inside, (a possibility the Court will not foreclose,) Plaintiffs have not briefed it.  Plaintiffs engage with the Blueprint as they imagine it to be, claiming "**every single attendee is prohibited from attending a worship service**," (Motion 19, (emphasis in original)), as opposed to engaging with the actual contours of the policy at hand.  Even assuming such harm exists, "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879 (internal quotations omitted).

## C.  Balance of Equities and the Public Interest

Where the government is the opposing party, balancing of the harm and the public interest merge.  <u>See</u> <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009).  Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction.  <u>Winter</u>, 555 U.S. at 24.

Plaintiffs argue "the State is in no way harmed by the issuance of an injunction" preventing enforcement of Blueprint restrictions.  (Motion 21 (internal quotations omitted.))  Not so.  There is compelling evidence that entering Plaintiffs' requested injunction would harm the public interest.  Scientific consensus is clear that Covid-19 is transmitted from person to person through respiratory droplets produced when a person or group of people talk, sing, cough, or breathe near each other.  (Watt Declaration ¶¶ 27-29.)  Indoor gatherings are riskier than outdoor gatherings; big gatherings are riskier than small gatherings; and gatherings which last for long periods of time are riskier than gatherings which last for short periods of time.  (<u>Id.</u>)

If Plaintiffs were to immediately resume numerically uncapped indoor worship, it is likely that this indoor worship—like any indoor activity involving members of multiple households—would contribute to the spread of Covid-19, straining already-stressed public health infrastructure and filling already-packed ICUs.

## V.   CONCLUSION

Plaintiffs paint a stark picture.  They claim that Tier 1 "totally prohibit[s] religious worship services of any kind and any number."  (Motion 3.)  This is not true.  The First Amendment has not taken a sabbatical.  Californians may still worship, attend services, pray, and otherwise exercise their religious freedoms.  They just may not do so in ways that significantly increase the likelihood of transmission of a virus which has claimed more than three hundred thousand American lives in less than one year.  The Constitution is not a suicide pact.[9]  The First Amendment may not be used to make it one.

Plaintiffs' Emergency Motion for Temporary Restraining Order (Dkt. No. 58) is DENIED.

**IT IS SO ORDERED.**

---

[9] See Terminiello v. Chicago, 337 U.S. 1, 37 (1949) (dissenting opinion).